

ORIGINAL

**United States District Court**
**Northern District of Texas**
**Dallas Division**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

DEC - 2 2005

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| Gryphon Master Fund, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Cause No. **3-05CV2382-B** |
| | § | |
| Cobalis Corp., | § | |
| | § | |
| Defendant. | § | |

---

### Plaintiff's Original Complaint

---

Plaintiff Gryphon Master Fund, L.P. ("Gryphon") brings this lawsuit against Cobalis Corp. ("Cobalis") and respectfully shows as follows:

#### Jurisdiction and Venue

1.      Gryphon is a Bermuda limited partnership with its principal place of business at 100 Crescent Court, Suite 490, Dallas, Texas 75201.

2.      Cobalis is a Nevada corporation with its principal place of business in Irvine, California. Cobalis does not maintain an agent for service of process in Texas but may be served through the Texas Secretary of State under §17.044(b) of the Texas Civil Practice and Remedies Code because Cobalis conducted business in Texas by entering into contracts that are performable in whole or in part in Texas. The Texas Secretary of State should send the citation to Cobalis's registered agent, Incorp Services Inc., 3155 East Patrick Lane, Suite 1, Las Vegas, Nevada 89120-3481.

3.      This Court has personal jurisdiction over Cobalis. In the agreements that form the basis of this lawsuit Cobalis consented to the jurisdiction of this Court and agreed to

accept service outside the State of Texas by registered mail, personal service, or any other manner permissible under the Court's rules.

4.     This Court has subject-matter jurisdiction over this lawsuit under 28 U.S.C. § 1332(a).  As required by § 1332(a), this lawsuit is between citizens of different states and the amount in controversy exceeds the sum and value of $75,000, exclusive of interest and costs.

5.     Venue is proper before this Court.  A substantial part of the acts and omissions resulting in this lawsuit occurred in this district.  In addition, in the agreements that form the basis of this lawsuit, Cobalis agreed that venue would be proper before this Court.

### The Parties

6.     Gryphon is an investment partnership located in Dallas, Texas, that through equity, debt, and derivative securities invests in a diverse array of public and private companies.

7.     Cobalis is in the business of developing and marketing over-the-counter pharmaceuticals.

### Factual Background

8.     Gryphon and Cobalis executed two purchase agreements in September 2003 whereby Cobalis issued certain securities to Gryphon in exchange for Gryphon's $1,600,000 investment (the "Purchase Agreements").

9.     Under the first purchase agreement, executed on September 8, 2003, Gryphon acquired an 8% Convertible Note Due September 8, 2006 (the "Convertible Note").[1]  The

---

[1]     A true and correct copy of the purchase agreement executed September 8, 2003, is attached as Exhibit A and incorporated by reference.

**Plaintiff's Original Complaint**                                                          **Page 2**

Convertible Note is convertible at $2.00 per share into 300,000 shares of Cobalis's common stock.

10.    Under the second purchase agreement, executed on September 25, 2003, Gryphon acquired preferred stock convertible at $2.40 per share into 416,667 shares of Cobalis's common stock (with the 300,000 shares issuable upon conversion of the Convertible Note, the "Convertible Shares").[2]

11.    Because Cobalis committed various defaults and breaches in connection with the Purchase Agreements, Cobalis issued to Gryphon 135,000 shares of its common stock on January 23, 2004, and 170,000 shares of its common stock on May 28, 2004 in exchange for Gryphon agreeing to forbear, for a limited period of time, from exercising it rights and remedies under the Purchase Agreements and related documents as a result of such defaults and breaches.  Of those 305,000 shares, Gryphon remains the owner and holder of 94,150 shares (the "Forbearance Shares").

12.    As restricted securities, the Forbearance Shares and the Convertible Shares are not tradable on the open market.  The certificates for the Forbearance Shares include, and the certificates for the Convertible Shares will include, the following restrictive legend: "The shares represented by this certificate may not be transferred without (i) the opinion of counsel reasonably satisfactory to the corporation that such transfer may lawfully be made without registration under the Securities Act of 1933, as amended (the "1933 Act"), or qualification under applicable state securities laws; or (ii) such registration or

---

[2]    A true and correct copy of the purchase agreement executed September 25, 2003, is attached as Exhibit B and incorporated by reference.

qualification."[3] Thus, two avenues exist for Gryphon to be able to publicly sell the Forbearance Shares and the Convertible Shares.

13.    First, the Forbearance Shares and the Convertible Shares would be publicly tradable by Gryphon upon Cobalis obtaining an effective registration statement for the public resale thereof. Indeed, with the Purchase Agreements, Cobalis obligated itself to file a registration statement with the United States Securities and Exchange Commission (the "SEC") for shares issued or issuable to Gryphon. Cobalis breached its registration obligations by failing to timely file a registration statement and causing such registration statement to become effective, requiring Gryphon to file a lawsuit against Cobalis on November 11, 2004.[4]

14.    Second, the Forbearance Shares and the Convertible Shares would be publicly tradable by Gryphon with a legal opinion from Cobalis's legal counsel confirming the existence of an exemption from the 1933 Act's registration requirements. Rule 144 of the 1933 Act allows certain persons that have held restricted securities for a specified time period to sell the securities without registration. Here, the Convertible Shares qualify for exemption under Rule 144(k)'s two-year holding period. Similarly, the Forbearance Shares qualify for exemption under Rule 144's one-year holding period.

15.    The Purchase Agreements require Cobalis to issue certificates without a restrictive legend for the Convertible Shares upon the availability of a registration

---

[3]    True and correct copies of Gryphon's share certificates for 67,150 shares and 27,000 shares of Cobalis common stock are attached as Exhibits C and D and incorporated by reference. The language included in the restrictive legend is also required for the Convertible Shares by § 6.12(a) of the Purchase Agreements.

[4]    That case, *Gryphon Master Fund, L.P. v. Cobalis Corp.*, Cause No. 3:04cv2405L in the United States District Court for the Northern District of Texas, Dallas Division, is set for trial on April 3, 2006.

exemption under the 1933 Act. The Purchase Agreements in Section 6.12 provide that "upon Rule 144(k) under the 1933 Act becoming available, the Company shall promptly . . . cause certificates evidencing [the Convertible Shares] previously issued to be replaced with certificates which do not bear the restrictive legends."

16.   Based on Gryphon's desire to be able to freely trade the Forbearance Shares and the Convertible Shares, on November 14, 2005, Gryphon's agent requested that Cobalis issue opinion letters confirming the availability of Rule 144's exemptions.[5]

17.   Cobalis is required to provide such additional documents as are necessary to fulfill the purposes of the Purchase Agreements. Accordingly, Cobalis must "execute and deliver all such further instruments and documents and take all such other actions as may reasonably be required to carry out the transactions contemplated hereby and to evidence the fulfillment of the agreements herein contained."[6]

18.   By email on November 16, 2005, and by letters dated November 21, 2005, and December 1, 2005, Gryphon's counsel reiterated Gryphon's request for Rule 144 opinion letters.[7] Cobalis has refused to meet Gryphon's requests.

19.   By ignoring its contractual duties to Gryphon, Cobalis has deprived Gryphon of valuable opportunities to trade the Forbearance Shares and the Convertible Shares. For example, when Gryphon first requested the opinion letters, on November 14, 2005,

---

[5]   A true and correct copy of the email from J.P. Bruneau to B. Cosic on November 14, 2005, is attached as Exhibit E and incorporated by reference.

[6]   See Exhibits A and B at § 9.10.

[7]   True and correct copies of the November 16, 2005, email from K. McCrea to J. Larsen, the November 21, 2005, letter from K. McCrea to J. Larsen, and the December 1, 2005, letter from K. McCrea to J. Larsen are attached respectively as Exhibits F, G and H and incorporated by reference.

**Plaintiff's Original Complaint**                                                        **Page 5**
507064.000004 DALLAS 1966760.1

Cobalis's stock was trading at a one-year high of $2.00 per share.[8] The trading price eventually hit $2.15 on November 18, 2005. On November 30, the stock had dropped to $1.45. In the meantime, Cobalis has filed with the SEC a registration statement on Form S-3 covering the resale of 562,706 shares, which include bonuses and wages to directors and its employees, for the benefit of certain of its directors and employees.

20.     Cobalis's refusal to issue the opinion letter for the Forbearance Shares and clean certificates and opinion letters for the Convertible Shares has caused, and will continue to cause, damage to Gryphon by preventing Gryphon from being able to freely trade the Forbearance Shares and the Convertible Shares, which it is legally entitled to do at this time. Gryphon's damages are amplified by the fact that Cobalis's common stock has been trading at highs not seen in the past year. Gryphon's damages are also exacerbated because Cobalis has registered the resale of 562,706 shares of common stock since Gryphon's request for the opinion letters and those shares, unlike Gryphon's shares, now benefit from being freely tradable. Thus, not only has Cobalis restricted Gryphon's ability to trade its shares during the recent highs, it has added shares to that market with the possibility that those shareholders will sell their shares and depress the stock price.

### Breach of Contract

21.     Gryphon realleges Paragraphs 1 thru 20 as if fully set forth herein.

22.     The sale by Gryphon of the Forbearance Shares and the Convertible Shares is exempt from the 1933 Act's registration requirements under Rule 144 because Gryphon has met the respective one-year and two-year holding periods.

---

[8]     A true and correct copy of the most recent month's trading data for Cobalis's common stock is attached as Exhibit I and incorporated by reference.

**Plaintiff's Original Complaint**                                                                **Page 6**

23.    The certificates for the Forbearance Shares, and the certificates to be issued for the Convertible Shares, allow Gryphon to trade the shares upon the availability of a Rule 144 exemption.  Because the Convertible Shares qualify for the Rule 144 exemption, Cobalis must issue clean certificates for the shares under Section 6.12 of the Purchase Agreements.  Further, Section 9.10 of the Purchase Agreements requires Cobalis to issue "all such further instruments and documents" that may be necessary to carry out the transactions contemplated by the Purchase Agreements, which necessarily includes the issuance of Rule 144 opinion letters for the Forbearance Shares and the Convertible Shares.

24.    Gryphon demanded that Cobalis comply with its obligations with respect to the Forbearance Shares and the Convertible Shares, but Cobalis has refused.

25.    Cobalis's refusal to meet its obligations under the Purchase Agreements amounts to a breach of contract and has damaged Gryphon.

26.    Gryphon is entitled to recover its reasonable and necessary attorneys' fees from this lawsuit under Texas Civil Practice & Remedies Code § 38.001.  In addition, Gryphon is entitled to recover its attorneys' fees and expenses under the parties' agreements that form the basis of this lawsuit.

### Failure to Remove the Restrictive Legends and Issue Rule 144 Opinion Letters

27.    Gryphon realleges Paragraphs 1 thru 20 as if fully set forth herein.

28.    Under Nevada Revised Statute § 78.235, Gryphon is entitled to a certificate showing the number of Convertible Shares that it owns.  By implication, therefore, Gryphon is entitled to a share certificate that correctly recites whether the shares remain

subject to the transfer restrictions identified on the restrictive legend.[9]  Cobalis's refusal to issue the appropriate share certificate for the Convertible Shares, along with the requisite opinion letters, amounts to an unjustified refusal by Cobalis to issue share certificates to which Gryphon is entitled.  Cobalis is, therefore, in violation of its statutory duty under Nevada Revised Statute § 78.235.  Cobalis's failure to fulfill its statutory duty has damaged Gryphon.

29.     Cobalis has also breached its statutory duty to Gryphon under Nevada Revised Statute § 104.8401 by refusing to issue Rule 144 opinion letters for the Forbearance Shares and the Convertible Shares and clean certificates for the Convertible Shares.  Section 104.8401 requires Cobalis to "register the transfer" of Gryphon's shares.[10]  Recognizing Rule 144's applicability to the Forbearance Shares and the Convertible Shares is "a ministerial act that must occur before the securities can be transferred."[11]  Issuing clean certificates for the Convertible Shares is another such ministerial act.[12]  By failing to issue opinion letters for the Forbearance Shares and the Convertible Shares, and by failing to issue clean certificates for the Convertible Shares, Cobalis has violated its statutory duty under Nevada Revised Statute § 104.8401.  Cobalis's failure to fulfill its statutory duty has damaged Gryphon.

---

[9]     *C.f. Bender v. Memory Metals, Inc.*, 514 A.2d 1109, 1115 (Del. Ch. 1986) (recognizing that similar Delaware statute created "right to a proper certificate without a legend or restriction, where such legend is no longer appropriate").

[10]    *Id.* (finding that identical Delaware statute created obligation to issue new share certificate).

[11]    *Burtman v. Technical Chems. & Prods., Inc.*, 724 So. 2d 672, 675 (Fla. Dist. Ct. App. 1999) (recognizing a cause of action for failure to perform ministerial duties required for the transfer of stock).

[12]    *Bender*, 514 A.2d at 1115 (finding that identical Delaware statute created obligation to issue new share certificate).

### Prayer

For these reasons, Gryphon requests that Cobalis be cited to appear and answer herein, and that judgment be entered against Cobalis, and in favor of Gryphon for:

1.   Damages sustained by Gryphon because of Cobalis's breach of its contractual and statutory duties;

2.   Pre-judgment interest at the maximum rate allowable by law;

3.   Post-judgment interest at the maximum rate allowable by law;

4.   Attorneys' fees;

5.   Costs of court; and

6.   Such other relief, both general and specific, at law and in equity, to which Gryphon may be justly entitled.

Respectfully submitted,

_____
Stephen C. Rasch
State Bar No. 16551420

Kim McCrea
State Bar No. 24041434

Thompson & Knight LLP
1700 Pacific Avenue, Suite 3300
Dallas, Texas 75201
Phone: (214) 969-1700
Fax:    (214) 999-1751

ATTORNEYS FOR
GRYPHON MASTER FUND, L.P.

# PURCHASE AGREEMENT

### dated as of September 8, 2003

### by and between

## BIOGENTECH CORP.

### and

## GRYPHON MASTER FUND, L.P.

---

### 8% CONVERTIBLE NOTE DUE 2006

### and

## COMMON STOCK PURCHASE WARRANT

# BIOGENTECH CORP.

## PURCHASE AGREEMENT

### 8% CONVERTIBLE NOTE DUE 2006

### and

## COMMON STOCK PURCHASE WARRANT

## TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| 1. | Definitions. | 1 |
| 2. | Purchases and Sales of the Note and Warrant | 5 |
|  | 2.1 Purchase and Sale. | 5 |
|  | 2.2 Form of Payment. | 6 |
|  | 2.3 Closing. | 6 |
| 3. | Representations and Warranties of the Company. | 6 |
|  | 3.1 Organization, Good Standing and Qualification | 6 |
|  | 3.2 Authorization. | 7 |
|  | 3.3 Capitalization. | 7 |
|  | 3.4 Valid Issuance. | 8 |
|  | 3.5 Consents. | 8 |
|  | 3.6 Delivery of SEC Filings; Business; Non-Public Information | 8 |
|  | 3.7 Use of Proceeds. | 8 |
|  | 3.8 No Material Adverse Change. | 9 |
|  | 3.9 Registration Statements. | 10 |
|  | 3.10 Form S-3 Eligibility. | 10 |
|  | 3.11 No Conflict, Breach, Violation or Default. | 10 |
|  | 3.12 Tax Matters. | 11 |
|  | 3.13 Title to Properties. | 11 |
|  | 3.14 Certificates, Licenses, Authorizations and Permits. | 11 |
|  | 3.15 No Labor Disputes. | 11 |
|  | 3.16 Intellectual Property. | 12 |
|  | 3.17 Environmental Matters. | 12 |
|  | 3.18 Litigation. | 13 |
|  | 3.19 Financial Statements. | 13 |
|  | 3.20 Insurance Coverage. | 13 |
|  | 3.21 Sarbanes-Oxley. | **Error! Bookmark not defined.** |
|  | 3.22 Acknowledgement of Potential Dilution | 13 |

3.23   Brokers and Finders. ...................................................14
3.24   No Directed Selling Efforts or General Solicitation. ...................14
3.25   No Integrated Offering..................................................14
3.26   Disclosures............................................................14
3.27   Absence of Rights Agreement. ..........................................14

4.   Representations and Warranties of the Purchaser. ........................14
4.1    Organization and Existence.............................................15
4.2    Purchase Entirely for Own Account. ....................................15
4.3    Investment Experience. ................................................15
4.4    Disclosure of Information. ............................................15
4.5    Restricted Securities. ................................................15
4.6    Accredited Investor. ..................................................15
4.7    No General Solicitation................................................15
4.8    Residency of Purchaser. ...............................................15
4.9    Brokers and Finders. ..................................................16
4.10   Authorization..........................................................16
4.11   Risk Factors...........................................................16
4.12   Reliance. .............................................................16
4.13   No Representations. ...................................................16
4.14   Survival. .............................................................16

5.   Registration Rights Agreement...........................................16
5.1    Registration Rights Agreement. .......................................16

6.   Certain Covenants of the Company and the Purchaser.......................17
6.1    19.99% Cap; Rule 144. .................................................17
6.2    Limitation on Certain Transactions.....................................17
6.3    Right of the Purchasers to Participate in Future Transactions.18
6.4    Reports and Information................................................19
(a)    Quarterly Financial Information........................................20
(b)    Annual Financial Information...........................................20
(c)    Stockholder and Analyst Reports and Information........................20
(d)    Other Information. ....................................................20
(e)    Rule 144. .............................................................21
6.5    Press Releases. .......................................................21
6.6    No Conflicting Agreements..............................................21
6.7    Insurance..............................................................21
6.8    Compliance with Laws...................................................21
6.9    Listing of Underlying Shares and Warrant Shares
       and Related Matters. ..................................................21
6.10   Corporate Existence. ..................................................22
6.11   Form 8-K...............................................................23
6.12   Legends................................................................23

7.  Conditions to the Company's Obligations to Issue and Sell. ...............24

8.  Conditions to the Purchaser's Obligations to Purchase. ......................24

9.  Miscellaneous. ................................................................................25
    9.1   Successors and Assigns. ........................................................25
    9.2   Counterparts. .........................................................................26
    9.3   Titles and Subtitles. ...............................................................26
    9.4   Notices. ..................................................................................26
    9.5   Expenses. ...............................................................................27
    9.6   Amendments and Waivers. .....................................................27
    9.7   Severability. ............................................................................27
    9.8   Entire Agreement. ..................................................................27
    9.9   Survival. .................................................................................27
    9.10  Further Assurances. ...............................................................27
    9.11  Applicable Law. ......................................................................28
    9.12  Remedies. ...............................................................................28
    9.13  Jurisdiction. ...........................................................................28

**EXHIBITS**

Exhibit A – Form of Note
Exhibit B – Form of Warrant
Exhibit C – Form of Registration Rights Agreement
Exhibit D – Form of Opinion of Legal Counsel to the Company

# PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** dated as of September 8, 2003 (this "Agreement"), by and between **BIOGENTECH CORP.**, a Nevada corporation (the "Company"), and **GRYPHON MASTER FUND, L.P.**, a Burmuda limited partnership (the "Purchaser").

# W I T N E S S E T H:

**WHEREAS,** the Purchaser wishes to purchase from the Company, and the Company wishes to sell and issue to the Purchaser, upon the terms and subject to the conditions of this Agreement, (i) a Note (such capitalized term and all other capitalized terms used herein having the respective meanings provided herein) in principal amount of $600,000 and (ii) a Warrant initially entitling the holder to purchase an aggregate of 90,000 shares of Common Stock for the Purchase Price; and

**WHEREAS,** at or before the Closing, the parties hereto are executing and delivering, one to the other, the Registration Rights Agreement, pursuant to which, among other things, the Company will agree to provide certain registration rights under the 1933 Act, and the rules and regulations promulgated thereunder, and applicable state securities laws for the resale of the shares of Common Stock issuable upon conversion of the Note and issuable upon exercise of the Warrant.

**NOW THEREFORE,** in consideration of the premises and the mutual covenants made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1.　*Definitions.*

1.1　As used in this Agreement, the terms "Agreement", "Company" and "Purchaser" shall have the respective meanings assigned to such terms in the introductory paragraph of this Agreement.

1.2　All the agreements or instruments herein defined shall mean such agreements or instruments as the same may from time to time be supplemented or amended or the terms thereof waived or modified to the extent permitted by, and in accordance with, the terms thereof and of this Agreement.

1.3    The *following terms* shall have the *following meanings* (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the subject Person.  For purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Aggregation Parties" shall have the meaning provided in Section 6.3(b).

"AMEX" means the American Stock Exchange, Inc.

"Approved Markets" shall have the meaning provided in Section 6.9.

"Board of Directors" means the Board of Directors of the Company.

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks in the City of Dallas are authorized or required by law or executive order to remain closed.

"Change in Control Transaction" shall have the meaning to be provided or provided in the Note.

"Closing" means the closing of the purchase and sale of the Note and Warrant on the Closing Date.

"Closing Date" means 10 a.m., Dallas, Texas time, on September 8, 2003, or such other time or date as mutually agreed by the parties hereto.

"Closing Location" means 100 Crescent Court, Suite 590, Dallas, Texas 75201.

"Common Stock" means the Common Stock, $.001 per share, of the Company.

"Common Stock Equivalent" means any warrant, option, subscription or purchase right with respect to shares of Common Stock, any security convertible into, exchangeable for, or otherwise entitling the holder thereof to acquire, shares of

-2-

Common Stock or any warrant, option, subscription or purchase right with respect to any such convertible, exchangeable or other security.

"Encumbrances" means all mortgages, deeds of trust, claims, security interests, liens, pledges, leases, subleases, charges, escrows, options, proxies, rights of occupancy, rights of first refusal, preemptive rights, covenants, conditional limitations, hypothecations, prior assignments, easements, title retention agreements, indentures, security agreements or any other encumbrances of any kind.

"Environmental Law" shall have the meaning provided in Section 3.17.

"Event of Default" shall have the meaning to be provided or provided in the Note.

"Excluded Shares" shall have the meaning provided in Section 6.3(b).

"Generally Accepted Accounting Principles" means, for any Person, the United States generally accepted accounting principles and practices applied by such Person from time to time in the preparation of its audited financial statements.

"Intellectual Property" means all franchises, patents, trademarks, service marks, tradenames (whether registered or unregistered), copyrights, corporate names, licenses, trade secrets, proprietary software or hardware, proprietary technology, technical information, discoveries, designs and other proprietary rights, whether or not patentable, and confidential information (including, without limitation, know-how, processes and technology) used in the conduct of the business of the Company or any Subsidiary, or in which the Company or any Subsidiary has an interest.

"Material Adverse Effect" means a material adverse effect on the (i) business, properties, operations, condition (financial or other), results of operations or prospects of the Company and the Subsidiaries, taken as a whole; (ii) the validity or enforceability of, or the ability of the Company to perform its obligations under, the Transaction Documents; or (iii) rights and remedies of the Purchaser under the terms of the Transaction Documents.

"Nasdaq" means the Nasdaq National Market.

"Nasdaq Small Cap" means the Nasdaq Small Cap Market.

"1934 Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"1933 Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Note" means the Company's 8% Convertible Note due 2006 in the principal amount of $600,000.00 in the form attached as **Exhibit A.**

"NYSE" means the New York Stock Exchange, Inc.

"OTCBB" means the OTC Bulletin Board.

"Person" means an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, pool, syndicate, sole proprietorship, unincorporated organization, governmental authority or any other form of entity not specifically listed herein.

"Purchase Price" means the amount shown on the signature pages to this Agreement as the Purchaser's Purchase Price.

"Purchaser Share Notice" shall have the meaning provided in Section 6.12.

"Registration Rights Agreement" means the Registration Rights Agreement by and between the Company and the Purchaser in the form attached as **Exhibit C**.

"Registration Statement" shall have the meaning provided in the Registration Rights Agreement.

"Regulation D" means Regulation D adopted by the SEC under the 1933 Act.

"Restricted Ownership Percentage" shall have the meaning provided in Section 6.3(b).

"SEC" means the U.S. Securities and Exchange Commission.

"SEC Filings" means the Company's Annual Report on Form 10-KSB for the fiscal year ended December 31, 2002 and all other reports filed by the Company pursuant to Section 13 or 15(d) of the 1934 Act since December 31, 2002.

"Securities" means the Note, the Underlying Shares, the Warrant and the Warrant Shares.

"Subsidiary" means any corporation or other entity of which a majority of the capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by the Company.

"Transaction Documents" means this Agreement, the Registration Rights Agreement, the Note and the Warrant.

"20% Cap" shall have the meaning provided in Section 6.1(a).

"2002 10-K" means the Company's Annual Report on Form 10-KSB for the fiscal year ended December 31, 2002, as filed as the SEC.

"Underlying Shares" means the shares of Common Stock issued or issuable upon conversion of the Note.

"Variable Rate Transaction" means a transaction in which the Company issues or sells any Common Stock or Common Stock Equivalent (a) that is convertible into, exchangeable or exercisable for, or includes the right to receive additional shares of Common Stock either (x) at a conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for the Common Stock at any time after the initial issuance of such debt or equity securities, or (y) with a fixed conversion, exercise, exchange or purchase price that is subject to being reset at some future date after the initial issuance of Common Stock or Common Stock Equivalent or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock (but excluding standard stock split, reverse stock split and stock dividend anti-dilution provisions), or (b) pursuant to an "equity line" structure which provides for the sale, from time to time, of securities of the Company which are registered for sale or resale pursuant to the 1933 Act.

"Warrant" means the Company's Common Stock Purchase Warrant in the form attached hereto as **Exhibit B**.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of or otherwise pursuant to the Warrant.

### 2. *Purchases and Sales of the Note and Warrant.*

**2.1 *Purchase and Sale*.** Upon the terms and subject to the conditions of this Agreement, the Purchaser hereby agrees to purchase from the Company, and the Company hereby agrees to sell to the Purchaser, on the Closing Date, the Note and the Warrant for the Purchase Price.

**2.2    *Payment.*** Payment by the Purchaser of the Purchase Price to the Company at the Closing on the Closing Date shall be made as follows:

(a)    the Purchaser shall pay to Warren W. Garden, P.C. an amount equal to $17,500 payable by the Company pursuant to Section 9.5, by wire transfer of immediately available funds to an account designated by such firm;

(b)    the Purchaser shall pay to CK Cooper & Company an amount equal to $66,000 payable by the Company to such firm as a finder, by wire transfer of immediately available funds to an account designated by such firm; and

(c)    Purchaser shall pay to the Company the balance of the Purchase Price, after determination and deduction therefrom of the amounts to be paid pursuant to Sections 2.2(a) and (b), by wire transfer of immediately available funds to an account designated by the Company.

(d)    For all purposes, upon payment of the amounts provided for in this Section 2.2, the Purchaser shall be deemed to have paid the Purchase Price in full to the Company and to have disbursed on behalf of the Company the amounts provided in Sections 2.2(a) and (b). By agreeing to disburse funds on behalf of the Company as provided in this Section 2.2, in no event shall the Purchaser have any liability to any Person, including, without limitation, the Persons identified in Sections 2.2(a) and (b), for payment or performance of any obligation or liability of the Company to such Person.

**2.3    *Closing.*** The sale and purchase of the Note and Warrant shall occur on the Closing Date at the Closing Location.  At the Closing on the Closing Date, upon the terms and subject to the conditions of this Agreement,

(A)    the Company shall issue and sell to the Purchaser the Note and the Warrant and payment by the Purchaser to the Company of an amount equal to the Purchase Price as provided in Section 2.2, and

(B)    the Purchaser shall pay to the Company an amount equal to the Purchase Price, as provided in Section 2.2, against issuance and sale by the Company to the Purchaser of the Note and Warrant.

**3.    *Representations and Warranties of the Company.*** The Company hereby represents and warrants to, and covenants and agrees with, the Purchaser that:

**3.1    *Organization, Good Standing and Qualification.*** The Company and each Subsidiary is a corporation duly incorporated, validly existing and subsisting under the laws of the jurisdiction of its incorporation and has all

requisite corporate power and authority to carry on its business as now conducted and to own its properties. The Company and each Subsidiary is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property makes such qualification or licensing necessary unless the failure to so qualify would not be reasonably likely to result in a Material Adverse Effect. The Company has no Subsidiaries other than those listed in **Schedule 3.1** and has no investment in any other Person except such investments as would be classified as current assets on a balance sheet of the Company, prepared in accordance with Generally Accepted Accounting Principles.

      **3.2**    *Authorization.* The Company has full corporate power and authority and has taken all requisite action on the part of the Company, its officers, directors and stockholders necessary for (i) the authorization, execution and delivery of the Transaction Documents, (ii) the authorization of the performance of all obligations of the Company under the Transaction Documents, and (iii) the authorization, issuance (or reservation for issuance) and delivery of the Securities. The Transaction Documents constitute the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability, relating to or affecting creditors' rights generally.

      **3.3**    *Capitalization.* Set forth on **Schedule 3.3** hereto is (a) the authorized capital stock of the Company on the date hereof; (b) the number of shares of capital stock issued and outstanding on the date hereof; (c) the number of shares of capital stock issuable pursuant to the Company's stock option, stock purchase, stock award and similar plans; and (d) the number of shares of capital stock issuable and reserved for issuance pursuant to all Common Stock Equivalents outstanding or which the Company has agreed to issue (other than the Note and the Warrant). All of the issued and outstanding shares of the Company's capital stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights. No Person is entitled to preemptive or similar statutory or contractual rights with respect to any securities of the Company. Except as set forth on **Schedule 3.3** or in the SEC Filings, there are no outstanding Common Stock Equivalents or other rights, agreements or arrangements of any character under which the Company is or may be obligated to issue any equity securities of any kind, and except as contemplated by this Agreement, the Company is not currently in negotiations for the issuance of any Common Stock Equivalents or capital stock of any kind. The Company has no knowledge of any voting agreements, buy-sell agreements, option or right of first purchase agreements or other agreements of any kind among any of the security holders of the Company relating to the securities of the Company held by them. Except as set forth on **Schedule 3.3** and except for registration statements currently on file, the Company has not granted any Person the right (which is now outstanding or effective) to require the

Company to register any securities of the Company under the 1933 Act, whether on a demand basis or in connection with the registration of securities of the Company for its own account or for the account of any other Person.

**3.4    *Valid Issuance.*** The aggregate number of shares of Common Stock issued, outstanding and reserved for issuance is 26,364,708 is issued and outstanding and 1,925,000 shares are reserved for issuance. The Company does not have any obligation to issue shares of Common Stock for which it has not reserved an adequate number of shares of Common Stock. The Note and Warrant are duly authorized, and such Securities, and the Underlying Shares issuable upon conversion of the Note and Warrant Shares issuable upon exercise of the Warrant, have been duly authorized and when issued in accordance herewith and with the terms of the Note and Warrant, will be validly issued, fully paid, non-assessable and free and clear of all Encumbrances and restrictions, except for restrictions on transfer imposed by applicable securities laws.

**3.5    *Consents.*** The execution, delivery and performance by the Company of the Transaction Documents and the offer, issuance and sale of the Securities require no consent of, action by or in respect of, or filing with, any Person, governmental body, agency, or official other than filings that have been or will be made pursuant to applicable state securities laws and the requirements of the OTCBB and other than the filing of a Form D by the Company with the SEC, each of which the Company undertakes to file within the applicable time periods.

**3.6    *Delivery    of    SEC    Filings;    Business;    Non-Public Information.*** The Company has timely filed all material reports and other documents required to be filed with the SEC pursuant to the 1934 Act since December 31, 1999. At their respective times of filing with the SEC, the SEC Filings complied in all material respects with the requirements of the 1934 Act and did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. The Company and the Subsidiaries are engaged only in the business described in the SEC Filings, and the SEC Filings contain a complete and accurate description of the business of the Company and the Subsidiaries. The Company has not provided to the Purchaser (i) any information required to be filed under the 1934 Act that has not been so filed or (ii) any material non-public information concerning the Company and the Subsidiaries.

**3.7    *Use of Proceeds.*** The proceeds of the sale of the Note and the Warrant hereunder shall be used by the Company to partially fund the Company's obligations under its definitive agreement to acquire InnoFood, Inc.

**3.8    *No Material Adverse Change.*** Since the filing of the 2002 10-K or as otherwise identified and described in the SEC Filings subsequently filed by the Company with the SEC pursuant to the 1934 Act there has not been:

(i)    any material change in the consolidated assets, liabilities, financial condition or operating results of the Company and the Subsidiaries from that reflected in the financial statements included in the 2002 10-K, except changes in the ordinary course of business which have not had, in the aggregate, a Material Adverse Effect;

(ii)    any declaration or payment of any dividend, or any authorization or payment of any distribution, on any of the capital stock of the Company, or any redemption or repurchase of any securities of the Company or any Subsidiary;

(iii)    any material damage, destruction or loss, whether or not covered by insurance, to any assets or properties of the Company or any Subsidiary;

(iv)    any waiver by the Company or any Subsidiary of a material right or of a material debt owed to it which waiver is adverse to the Company or any Subsidiary;

(v)    any satisfaction or discharge of any Encumbrance or payment of any obligation by the Company or any Subsidiary, except in the ordinary course of business and which is not material to the assets, properties, prospects, financial condition, operating results or business of the Company and the Subsidiaries taken as a whole (as such business is presently conducted and the Company has publicly disclosed it is proposed to be conducted);

(vi)    any material change or amendment to a material contract or arrangement by which the Company or any Subsidiary or any of their respective assets or properties is bound or subject;

(vii)    any material labor difficulties or labor union organizing activities with respect to employees of or contractors to the Company or any Subsidiary;

(viii)    any transaction entered into by the Company or any Subsidiary other than in the ordinary course of business; or

(ix)    any other event or condition of any character that may have a Material Adverse Effect.

**3.9    *Registration Statements.***  During the preceding two years, each registration statement and any amendment thereto filed by the Company pursuant to the 1933 Act, as of the date such registration statement or amendment became effective, complied as to form in all material respects with the 1933 Act, and did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading; and each prospectus or supplement filed pursuant to Rule 424 under the 1933 Act, as of its issue date and as of the closing of any sale of securities pursuant thereto did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

**3.10    *Form S-3 Eligibility.***  The Company is currently eligible to register the resale of its Common Stock in a secondary offering on a registration statement on Form S-3 under the 1933 Act and the Company shall maintain such eligibility at least until the Registration Statement is ordered effective by the SEC.

**3.11    *No Conflict, Breach, Violation or Default.***    (a) The execution, delivery and performance of the Transaction Documents by the Company and the issuance and sale of the Securities will not conflict with or result in a breach or violation of any of the terms and provisions of, or constitute a default under (i) the Company's Articles of Incorporation (including any articles of amendment or articles designating series of shares) or the Company's Bylaws, both currently in effect (copies of which have been provided to the Purchaser before the date hereof) and as in effect on the date of issuance of the Securities, (ii) any statute, rule, regulation or order of any governmental agency or body or any court, domestic or foreign, having jurisdiction over the Company or any Subsidiary or any of their respective assets or properties, or (iii) any agreement or instrument to which the Company or any Subsidiary is a party or by which the Company or any Subsidiary is bound or to which any of the properties of the Company or any Subsidiary is subject.

(b)    Except where it would not have a Material Adverse Effect, the Company and each Subsidiary (i) is not in violation of any statute, rule or regulation applicable to the Company or any Subsidiary or its assets, (ii) is not in violation of any judgment, order or decree applicable to the Company or any Subsidiary or any of their respective assets, and (iii) is not in breach or violation of any agreement, note or instrument to which it or its assets are a party or are bound or subject.  To the best of the Company's knowledge, neither the Company nor any Subsidiary has received notice from any Person of any claim or investigation that, if adversely determined, would render the preceding sentence untrue or incomplete.

**3.12  Tax Matters.** The Company and the Subsidiaries have timely prepared and filed all tax returns required to have been filed by the Company with all appropriate governmental agencies and timely paid all taxes owed by them, except where failure to make such payment would not have a Material Adverse Effect. The charges, accruals and reserves on the books of the Company and the Subsidiaries in respect of taxes for all fiscal periods are adequate in all material respects, and there are no material unpaid assessments against the Company or any Subsidiary nor, to the knowledge of the Company, any basis for the assessment of any additional taxes, penalties or interest for any fiscal period or audits by any foreign, U.S. federal, state, representations or warranties in or local taxing authority, except such as are not material. All material taxes and other assessments and levies that the Company or any Subsidiary is required to withhold or to collect for payment have been duly withheld and collected and paid to the proper governmental entity or third party when due. There are no tax liens or claims pending or threatened against the Company or any Subsidiary or any of their respective assets or property which if adversely decided, would have a Material Adverse Effect. There are no outstanding tax sharing agreements or other such arrangements between the Company or any Subsidiary and any other Person.

**3.13  Title to Properties.** Except as disclosed in the SEC Filings, the Company and each Subsidiary has good and marketable title to all real properties and all other properties and assets owned by it, in each case free from Encumbrances and defects that would materially affect the value thereof or materially interfere with the use made or currently planned to be made thereof by the Company or such Subsidiary; and except as disclosed in the SEC Filings, the Company and each Subsidiary holds any leased real or personal property under valid and enforceable leases with no exceptions that would materially interfere with the use made or currently planned to be made thereof by the Company or such Subsidiary.

**3.14  Certificates, Licenses, Authorizations and Permits.** The Company and each Subsidiary possesses adequate certificates, licenses, authorizations or permits issued by appropriate governmental agencies or bodies necessary to conduct the business now operated by it and has not received any notice of proceedings relating to the revocation or modification of any such certificate, license, authorization or permit that, if determined adversely to the Company or any Subsidiary, would individually or in the aggregate have a Material Adverse Effect.

**3.15  No Labor Disputes.** No material labor dispute with the employees of or contractors to the Company or any Subsidiary exists or, to the knowledge of the Company, is imminent.

**3.16  Intellectual Property.** (1) The Company and each Subsidiary holds all Intellectual Property, free and clear of all Encumbrances and restrictions on use or transfer, whether or not recorded, and has sole title to and ownership of or has the full, exclusive (subject to the rights of its licensees or licensors) right to use in its field of business, for the life of the proprietary right all Intellectual Property; (2) the use of the Intellectual Property by the Company or any Subsidiary does not, to the knowledge of the Company after due inquiry, violate or infringe on the rights of any other Person; (3) neither the Company nor any Subsidiary has received any notice of any conflict between the asserted rights of others and the Company or any Subsidiary with respect to any Intellectual Property; (4) the Company and each Subsidiary has used its best efforts to perfect its rights in and to all Intellectual Property used by it in its business or in which it has an interest; (5) the Company and each Subsidiary are in compliance with all material terms and conditions of its agreements relating to the Intellectual Property; (6) neither the Company nor any Subsidiary is or has been a defendant in any action, suit, investigation or proceeding relating to infringement or misappropriation by the Company or any Subsidiary of any Intellectual Property; (7) neither the Company nor any Subsidiary has been notified of any alleged claim of infringement or misappropriation by the Company or any Subsidiary of any Intellectual Property; (8) the Company has no knowledge of any claim of infringement or misappropriation by the Company or any Subsidiary of any Intellectual Property; (9) to the knowledge (after due inquiry) of the Company, none of the products the Company and the Subsidiaries are researching, developing, propose to research and develop, make, have made, use, or sell, infringes or misappropriates any Intellectual Property right of any third party; (10) none of the trademarks and service marks used by the Company or any Subsidiary, to the knowledge of the Company after due inquiry, infringes the trademark or service mark rights of any third party; (11) to the Company's knowledge none of the material processes and formulae, research and development results and other know-how relating to the Company's or the Subsidiaries' respective businesses, the value of which to the Company or any Subsidiary is contingent upon maintenance of the confidentiality thereof, has been disclosed to any Person other than Persons bound by written confidentiality agreements; and (12) the Company owns directly, or possesses adequate rights to use, all Intellectual Property used in or relating to the development, manufacture, use, distribution or marketing of the Company's products, and none of such Intellectual Property is owned, claimed or used by, or subject to any Encumbrance of or by, any Subsidiary.

**3.17  Environmental Matters.** Neither the Company nor any Subsidiary is in violation of any statute, rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, "Environmental Laws"), does not own or operate any real property

-12-

contaminated with any substance that is subject to any Environmental Laws, is not liable for any off-site disposal or contamination pursuant to any Environmental Laws, and is not subject to any claim relating to any Environmental Laws, which violation, contamination, liability or claim would individually or in the aggregate have a Material Adverse Effect; and neither the Company nor any Subsidiary is aware of any pending investigation that might lead to such a claim.

**3.18   Litigation.** Except as set forth in the SEC Filings, there are no pending actions, suits or proceedings against or affecting the Company or any Subsidiary or any of their respective properties that, if determined adversely to the Company or such Subsidiary, would individually or in the aggregate have a Material Adverse Effect, or which are otherwise material in the context of the sale of the Securities; and to the Company's knowledge, no such actions, suits or proceedings are threatened or contemplated.

**3.19   Financial Statements.** The consolidated financial statements included in each SEC Filing present fairly and accurately in all material respects the consolidated financial position of the Company and the Subsidiaries as of the dates reported and the consolidated results of operations, changes in stockholders' equity and cash flows for the periods reported, all in conformity with Generally Accepted Accounting Principles applied on a consistent basis and in conformity with the rules and regulations of the SEC under the 1934 Act applicable to the Company. Except as set forth in the consolidated financial statements of the Company included in the SEC Filings filed prior to the date hereof, neither the Company nor any Subsidiary has any liabilities, contingent or otherwise, except those which individually or in the aggregate are not material to the financial condition or operating results of the Company and the Subsidiaries, taken as a whole.

**3.20   Insurance Coverage.** The Company and each Subsidiary maintains in full force and effect insurance coverage that is customary for comparably situated companies for the business being conducted and properties owned or leased by it, and the Company reasonably believes such insurance coverage to be adequate against all liabilities, claims and risks against which it is customary for comparably situated companies to insure.

**3.21   Sarbanes-Oxley.** The Company is in compliance with any and all applicable requirements of the Sarbanes-Oxley Act of 2002 that are effective as of the date hereof, and any and all applicable rules and regulations promulgated by the SEC thereunder that are effective as of the date hereof, except where such noncompliance would not have, individually or in the aggregate, a Material Adverse Effect.

**3.22   Acknowledgement of Potential Dilution.** The Company understands that the number of shares of Common Stock issuable pursuant to the

Note and Warrant may increase substantially and that such increase may have a dilutive effect on the Company's equity capitalization.

   **3.23   Brokers and Finders.**  The Purchaser shall have no liability or responsibility for the payment of any commission or finder's fee to any third party in connection with or resulting from this Agreement or the transactions contemplated by this Agreement by reason of any agreement of or action taken by the Company.

   **3.24   No Directed Selling Efforts or General Solicitation.**  Notwithstanding anything contained on any schedule hereto, neither the Company nor any Person acting on its behalf has conducted any general solicitation or general advertising (as those terms are used in Regulation D) in connection with the offer or sale of any of the Securities.

   **3.25   No Integrated Offering.**  Neither the Company nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would (1) adversely affect reliance by the Company on Section 4(2) of the 1933 Act for the exemption from registration for the transactions contemplated hereby or would require registration of the offer and sale of the Note and Warrant to the Purchaser under the 1933 Act; or (2) require the integration of the offering of the Securities with any other offering of securities for purposes of determining the need to obtain stockholder approval of the transactions contemplated hereby under the rules of the OTCBB.

   **3.26   Disclosures.**  For purposes of this Agreement and the transactions contemplated hereby, none of the representations or warranties made by the Company under any of the Transaction Documents and no written information furnished by the Company pursuant hereto, or in any other document, certificate or written statement furnished by the Company to the Purchaser or any authorized representative of the Purchaser, pursuant to the Transaction Documents or in connection therewith, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which they were made, not misleading.

   **3.27   Absence of Rights Agreement.**  The Company has not adopted a shareholder rights plan or similar arrangement relating to accumulations of beneficial ownership of Common Stock or a change of control in the Company.

   **4.      Representations and Warranties of the Purchaser.**  The Purchaser hereby represents and warrants to the Company that:

     **4.1**    *Organization and Existence.* Such Purchaser is a validly existing partnership and has all requisite partnership power and authority to invest in the Securities pursuant to this Agreement.

     **4.2**    *Purchase Entirely for Own Account.* The Securities to be acquired by the Purchaser pursuant to this Agreement will be acquired for the Purchaser's own account, not as nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of applicable securities laws, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same in violation of applicable securities laws.

     **4.3**    *Investment Experience.* The Purchaser acknowledges that it can bear the economic risk and complete loss of its investment in the Securities and has such knowledge of and experience with securities and financial or business matters that it is capable of evaluating the merits and risks of the purchase of the Note and Warrant.

     **4.4**    *Disclosure of Information.* The Purchaser has had an opportunity to review documents related to the Company and to ask questions of and receive answers from the Company regarding the terms and conditions of the offering of the Securities; *provided however,* that neither such inquiries nor any other investigation conducted by the Purchaser shall modify, amend, limit or otherwise affect the Purchaser's right to rely on the Company's representations and warranties contained in the Transaction Documents or made pursuant to the Transaction Documents.

     **4.5**    *Restricted Securities.* The Purchaser understands that the Note and Warrant are characterized as "restricted securities" under the U.S. federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the 1933 Act only in certain limited circumstances.

     **4.6**    *Accredited Investor.* The Purchaser is an "accredited investor" as defined in Rule 501(a) of Regulation D.

     **4.7**    *No General Solicitation.* The Purchaser did not learn of the offering of the Note and Warrant through any public advertising or general solicitation (as these terms are used in Regulation D).

     **4.8**    *Residency of Purchaser.* The Purchaser is a resident of the state or other jurisdiction indicated in the first paragraph of this Agreement.

**4.9  Brokers and Finders.** The Company shall have no liability or responsibility for the payment of any commission or finder's fee to any third party in connection with or resulting from this Agreement or the transactions contemplated by this Agreement by reason of any agreement of the Purchaser.

**4.10  Authorization.** The Purchaser has full partnership power and authority and has taken all requisite action on the part of the Purchaser and its partners necessary for (i) the authorization, execution and delivery of the Transaction Documents and (ii) the authorization of the performance of all obligations of the Purchaser under the Transaction Documents. The Transaction Documents constitute the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability, relating to or affecting creditors' rights generally.

**4.11  Risk Factors.** Without limiting any of the Purchaser's other representations and warranties hereunder, the Purchaser acknowledges that the Purchaser has reviewed and is aware of the risk factors described in the SEC Filings.

**4.12  Reliance.** The Purchaser has consulted its own financial, legal and tax advisors with respect to the economic, legal and tax consequences of an investment in the Note and Warrant and has not relied on the SEC Filings or the Company, its officers, directors or professional advisors as to such consequences.

**4.13  No Representations.** No oral representations have been made by the Company to the Purchaser in connection with the Transaction Documents; and no written representations have been made by the Company to the Purchaser other than as stated in the Transaction Documents and the SEC Filings.

**4.14  Survival.** The Purchaser acknowledges that the representations, warranties and agreements made by the Purchaser herein shall survive the execution and delivery of this Agreement and the purchase of the Note and Warrant.

**5.  Registration Rights Agreement.**

**5.1  Registration Rights Agreement.** The Company acknowledges and agrees that the Company's execution and delivery of, and full performance of its obligations under, the Registration Rights Agreement is a material inducement to the Purchaser to execute and deliver this Agreement and purchase and pay for the Note and Warrant.  The Company agrees to execute and deliver to the Purchaser the Registration Rights Agreement at or before the Closing.

## 6. *Certain Covenants of the Company and the Purchaser.*

### 6.1 *19.99% Cap; Rule 144.*

(a)     **19.99% Cap.** Notwithstanding anything contained herein or in the other Transaction Documents, if Rule 4350(i)(1)(D) of the Nasdaq is applicable the Company shall not be entitled to issue upon conversion of the Note and exercise of the Warrant an aggregate number of shares of Common Stock in excess of 19.99% of the Common Stock issued and outstanding on the date hereof, subject to appropriate and equitable adjustment for any stock split, stock dividend or reclassification of the Common Stock or similar event occurring after the date hereof (the "20% Cap"), unless the Company receives stockholder approval for such issuance. If Rule 4350(i)(1)(D) of the Nasdaq is applicable to the shares of Common Stock issuable upon conversion of the Note and exercise of the Warrant and the limitations thereof restrict the Company from issuing additional shares of Common Stock upon conversion of the Note or exercise of the Warrant, then the Company shall use its commercially reasonable best efforts to obtain, as promptly as practicable, but in no event later than 120 days thereafter, the stockholder approval that is necessary under the rules of the Nasdaq so that the 20% Cap would no longer be applicable to issuance of shares of Common Stock upon conversion of the Note and exercise of the Warrant.

(b)     **Rule 144.** The Company acknowledges that, for purposes of determining the holding period under Rule 144 for Underlying Shares issued upon conversion of, or in lieu of cash payment of principal of or interest on, the Note, the holding period of such Underlying Shares shall be tacked to the holding period of the Note and for purposes of determining the holding period under Rule 144 for Warrant Shares issued in a "net" or "cashless" exercise of the Warrant, the holding period of such Warrant Shares may be tacked to the holding period of the Warrant. The Company agrees not to take a position contrary thereto unless the SEC or its staff by rule or interpretation changes its rules and interpretations thereof in effect on the date of this Agreement or such rules or interpretations are held invalid or incorrect by a court of competent jurisdiction.

### 6.2 *Limitation on Certain Transactions.*

(a)     Beginning as of the date of this Agreement and until the effective date of the Registration Statement as contemplated by the Registration Rights Agreement, without the prior written consent of the Purchaser (which consent may be withheld in the Purchaser's discretion), the Company shall not issue or sell or agree to issue or sell any securities in a capital raising transaction prior to such date, unless such securities will not be, and are not, registered for sale or resale under the 1933 Act until on or after the effective date of the Registration Statement, provided that the limitation of this Section 6.2(a) shall not apply to

-17-

securities issued pursuant to the Company's duly adopted employee or director bona fide share and option plans.

(b)    So long as the Note remains outstanding, without the prior written consent of the registered holder of the Note (which consent may be withheld in such holder's discretion), the Company shall not issue or sell, or agree to issue or sell, any securities in a Variable Rate Transaction.

**6.3    *Right of the Purchaser to Participate in Future Transactions.***

(a)    *Right to Participate.*    So long as the Note remains outstanding, the Purchaser will have a right to participate in any sales of any of the Company's securities in a capital raising transaction on the terms and conditions set forth in this Section 6.3. During such period, the Company shall give ten Business Days advance written notice to the Purchaser prior to any non-public offer or sale of any of the Company's capital stock or any Common Stock Equivalents in a capital raising transaction by providing to the Purchaser a comprehensive term sheet containing all significant business terms of such a proposed transaction.  The Purchaser shall have the right to participate in such proposed transaction and to purchase 25 percent of such securities which are the subject of such proposed transaction for the same consideration and on the same terms and conditions as contemplated for such third-party sale (or such lesser portion thereof as specified by the Purchaser). If the Purchaser elects to exercise its rights hereunder it must deliver written notice to the Company within five (5) Business Days following receipt of the notice and comprehensive term sheet from the Company, which notice from the Purchaser shall be contingent upon receipt of satisfactory definitive documents for such transaction from the Company. If, subsequent to the Company giving notice to the Purchaser hereunder but prior to the Purchaser exercising its right to participate (or the expiration of the five-day period without response from the Purchaser or the rejection of such offer for such financing by the Purchaser), the terms and conditions of the proposed third-party sale are changed from that disclosed in the comprehensive term sheet provided to the Purchaser, the Company shall be required to provide a new notice and comprehensive term sheet reflecting such revised terms to the Purchaser hereunder and the Purchaser shall have the right, which must be exercised within five (5) Business Days of such new notice and such revised comprehensive term sheet, to exercise its rights to purchase the securities on such changed terms and conditions as provided hereunder.  In the event the Purchaser does not exercise its rights hereunder with respect to a proposed transaction within the period or periods provided, or affirmatively declines to engage in such proposed transaction with the Company, then the Company may proceed with such proposed transaction on the same terms and conditions as noticed to the Purchaser (assuming the Purchaser has consented to the transaction, if required, pursuant to Section 6.2 of this Agreement) with the Purchaser if it has

elected to participate in such proposed transaction, *provided* that if such proposed transaction is not consummated within 60 days following the Company's notice hereunder, then the right of first refusal hereunder shall again apply to the Purchaser for such proposed transaction. The rights and obligations under this Section 6.3 shall in no way diminish the other rights of the Purchaser pursuant to this Section 6.

        **(b)**    ***Limitation on Right of First Refusal.*** Notwithstanding anything to the contrary contained herein, the number of shares of Common Stock that may be acquired directly or through acquisition of Common Stock Equivalents by the Purchaser pursuant to any capital raising transaction as described in subsection (a) above shall not exceed a number that, when added to the total number of shares of Common Stock deemed beneficially owned by the Purchaser (other than by virtue of the ownership of securities or rights to acquire securities (including the Note and Warrant) that have limitations on the Purchaser's right to convert, exercise or purchase similar to the limitation set forth herein (the "Excluded Shares")), together with all shares of Common Stock deemed beneficially owned (not counting such affiliate's Excluded Shares) by the Purchaser (as defined in Rule 144 of the 1933 Act) (the "Aggregation Parties") that would be aggregated for purposes of determining whether such securities are beneficially owned by the Purchaser or for purposes of determining whether a group exists, in each such case for purposes of Section 13(d) of the 1934 Act and Regulation 13D-G thereunder, would result in beneficial ownership by the Purchaser or such group of more than 9.9% of the shares of the Company's Common Stock (the "Restricted Ownership Percentage"), computed in accordance with Regulation 13D-G. The Purchaser shall have the right at any time and from time to time to reduce its Restricted Ownership Percentage immediately upon notice to the Company in the event and only to the extent that Section 16 of the 1934 Act or the rules promulgated thereunder (or any successor statute or rules) is changed to reduce the beneficial ownership percentage threshold thereunder from 10%. If the Purchaser is unable by reason of the Restricted Ownership Percentage to acquire the full amount of securities which the Purchaser would otherwise be entitled to acquire pursuant to this Section 6.3 and thereafter, at any time prior to the repayment or conversion in full of the Purchaser's Note the Purchaser could acquire such securities without exceeding its Restricted Ownership Percentage, then the Purchaser shall be entitled to acquire such securities at such time.

        **6.4**    ***Reports and Information.*** For so long as the Purchaser beneficially owns any of the Securities, the Company will furnish to the Purchaser the following reports and information, each of which shall be provided to the Purchaser by e-mail (at such address as specified in writing by the Purchaser for such purpose) or reputable overnight courier:

    *(a)*    ***Quarterly Financial Information.*** In the absence of a Quarterly Report on Form 10-Q timely filed with the SEC for any of the Company's first three fiscal quarters in any fiscal year, within 45 days after the end of any such fiscal quarter consolidated balance sheets of the Company as at the end of each of the Company's first three fiscal quarters and the related consolidated statements of operations, stockholders' equity and cash flows for such period and for the portion of the Company's fiscal year ended on the last day of such quarter, all in reasonable detail and certified by the principal financial officer of the Company to have been prepared in accordance with Generally Accepted Accounting Principles, subject to year-end and audit adjustments.

    *(b)*    ***Annual Financial Information.*** In the absence of a Form 10-K timely filed with the SEC within 105 days after the end of any fiscal year, then within such period consolidated balance sheets of the Company as at the end of each fiscal year and the related consolidated statements of earnings, stockholders' equity and cash flows for such year, all in reasonable detail and accompanied by the report on such consolidated financial statements of an independent certified public accountant selected by the Company and reasonably satisfactory to the Purchaser.

    *(c)*    ***Stockholder and Analyst Reports and Information.*** Copies of all notices, financial statements, reports and documents as the Company shall send or make available generally to its stockholders or to financial analysts, promptly after providing same to the stockholders or financial analysts.

    *(d)*    ***Other Information.*** Such other information relating to the Company and the Subsidiaries as from time to time may reasonably be requested by the Purchaser provided the Company or its Subsidiary has such information available to it in the ordinary course of its business, and further provided that the Company, solely in its own discretion, determines that such information is not confidential in nature and disclosure to such Purchaser would not be harmful to the Company or its Subsidiary.

Notwithstanding anything to the contrary contained in this Section 6.4, the Company shall not disclose material nonpublic information to the Purchaser, or to advisors to or representatives of the Purchaser, unless prior to disclosure of such information the Company identifies such information as being material nonpublic information and provides the Purchaser, such advisors and representatives with the opportunity to accept or refuse to accept such material nonpublic information for review.  The Company may, as a condition to disclosing any material nonpublic information hereunder, require the Purchaser's advisors and representatives to enter into a confidentiality agreement (including an agreement with such advisors and representatives prohibiting them from trading in Common Stock during such period of time as they are in possession of material nonpublic information) in form reasonably satisfactory to the Company and the Purchaser.

*(e)* *Rule 144.* The Company agrees to make publicly available on a timely basis the information required by Rule 144(c) under the 1933 Act.

**6.5** *Press Releases.* Any press release or other publicity concerning this Agreement or the transactions contemplated by this Agreement shall be submitted to the Purchaser for comment at least two (2) Business Days prior to issuance, unless the release is required to be issued within a shorter period of time by law or pursuant to the rules of any Approved Market (if applicable). The Company shall, on the Closing Date, issue a press release concerning the transactions contemplated hereby. The Company's other press releases and other public information, to the extent concerning the Transaction Documents, shall contain such information as reasonably requested by the Purchaser and be reasonably approved by the Purchaser in writing prior to issuance.

**6.6** *No Conflicting Agreements.* The Company will not take any action, enter into any agreement or make any commitment that would conflict or interfere in any material respect with the obligations to the Purchaser under the Transaction Documents.

**6.7** *Insurance.* For so long as the Purchaser beneficially owns any of the Securities, the Company shall, and shall cause each Subsidiary to, have in full force and effect (a) insurance reasonably believed to be adequate on all assets and activities of a type customarily insured, covering property damage and loss of income by fire or other casualty, and (b) insurance reasonably believed to be adequate protection against all liabilities, claims and risks against which it is customary for companies similarly situated as the Company and the Subsidiaries to insure.

**6.8** *Compliance with Laws.* So long as the Purchaser beneficially owns any Securities, the Company will use reasonable efforts to comply with all applicable laws, rules, regulations, orders and decrees of all governmental authorities, except to the extent non-compliance (in one instance or in the aggregate) would not have a Material Adverse Effect.

**6.9** *Listing of Underlying Shares and Warrant Shares and Related Matters.* The Company agrees that if the Company applies to have its Common Stock or other securities traded on any other principal stock exchange or market, it will include in such application the Underlying Shares and Warrant Shares and will take such other action as is necessary to cause such Common Stock to be so listed. For so long as any Note or Warrant remains outstanding, the Company will take all action necessary to continue the listing and trading of its Common Stock on at least one of the OTC Bulletin Board, the Nasdaq Small Cap, the Nasdaq, the NYSE or the AMEX (collectively, "Approved Markets"), and will

-21-

comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of such exchange or market, as applicable, to ensure the continued eligibility for trading of the Common Stock thereon. Neither the Company nor any of its Affiliates, nor any Person acting on its or their behalf, shall directly or indirectly make any offers or sales of any security or solicit any offers to buy any security which may cause the integration of the offering hereunder with any other offering of securities for purposes of determining the need to obtain stockholder approval of the transactions contemplated hereby under any applicable rules of any Approved Market. Unless in its reasonable judgment such would constitute material non-public information, the Company shall notify the Purchaser in advance if it intends to make any private placement of securities within the six-month period after the Closing Date, and unless the Company shall have received stockholder approval of the transactions contemplated hereby under the rules of any Approved Market (if applicable), at the Purchaser's reasonable request, the Company shall request a ruling from such Approved Market in advance that such private placement will not be integrated with the transactions contemplated hereunder pursuant to the rules of such Approved Market.

**6.10  Corporate Existence.** So long as any Note or Warrant remains outstanding, the Company shall maintain its corporate existence, except in the event of a merger, consolidation, amalgamation or sale of all or substantially all of the Company's assets, as long as the surviving or successor entity in such transaction (a) assumes (jointly and severally with the Company if the Company continues to exist) the Company's obligations hereunder and under the agreements and instruments entered into in connection herewith, regardless of whether or not the Company would have had a sufficient number of shares of Common Stock authorized and available for issuance in order to fulfill its obligations hereunder and effect the conversion in full of all Notes and exercise in full of all Warrants outstanding as of the date of such transaction; (b) has no legal, contractual or other restrictions on its ability to perform the obligations of the Company hereunder and under the agreements and instruments entered into in connection herewith; and (c)(i) is a publicly traded corporation whose common stock and the shares of capital stock issuable upon conversion of the Note and exercise of the Warrant are (or would be upon issuance thereof) listed for trading on an Approved Market or (ii) if not such a publicly traded corporation, then the Person who will be the successor or surviving entity in such transaction, at the time it shall enter into a definitive agreement to complete such transaction, shall have agreed in writing with the Purchaser that it will, at the election of the Purchaser, purchase the Purchaser's Securities at a price equal to the greater of (a) 120% of the Purchase Price of such Securities or (b) the fair market value of such Securities on an as-converted and as-exercised basis based on the closing price immediately preceding such transaction or the redemption date, whichever is greater.

**6.11 *Form 8-K.*** Within one Business Day after the Closing Date, the Company will publicly report the issue and sale of the Note and Warrant by filing with the SEC a Current Report on Form 8-K under the 1934 Act which report shall describe the material terms and include copies of the Transaction Documents as exhibits to such report.

**6.12 *Legends.*** Until registration for resale pursuant to the Registration Rights Agreement or until sales under Rule 144 under the 1933 Act are permitted, certificates evidencing the Underlying Shares and the Warrant Shares may bear one or both of the following legends or legends substantially similar thereto:

(a) "The shares represented by this certificate may not be transferred without (i) the opinion of counsel reasonably satisfactory to the corporation that such transfer may lawfully be made without registration under the Securities Act of 1933 or qualification under applicable state securities laws; or (ii) such registration or qualification."

(b) If required by the authorities of any state in connection with the issuance of sale of the Securities, the legend required by such state.

Upon registration for resale pursuant to the Registration Rights Agreement or upon Rule 144(k) under the 1933 Act becoming available, the Company shall promptly (but in no event later than five Business Days after surrender of the legended certificates to the Company) cause certificates evidencing the Underlying Shares and Warrant Shares previously issued to be replaced with certificates which do not bear the restrictive legends set forth in the preceding clause (a) of this Section, and all Underlying Shares and Warrant Shares subsequently issued shall not bear the restrictive legend set forth in the preceding clause (a) of this Section. If the Purchaser notifies the Company that the Purchaser has not received such certificates without the restrictive legend set forth in the preceding clause (a) of this Section within three Business Days after surrender of such legended certificates (each, a "Purchaser Share Notice"), and the Purchaser does not receive such certificates without the restrictive legend set forth in the preceding clause (a) of this Section within two Business Days after giving a particular Purchaser Share Notice, then the Company shall pay cash liquidated damages to the Purchaser at the rate of 2% per month of the original Purchase Price of the Note and Warrant in respect of which such Underlying Shares and Warrant Shares are issuable or issued and for which the certificates have not been provided in compliance with the above, for so long as the Company fails to provide such certificates. A Purchaser Share Notice may be given by telephone or e-mail to the Company's Chief Financial Officer or General Counsel. The Purchaser agrees that any sale by the Purchaser of Underlying Shares and Warrant Shares pursuant to the Registration Statement shall be made by the Purchaser in compliance with the prospectus delivery requirements of the 1933 Act and in accordance with the plan of distribution set

forth in the Registration Statement and related prospectus, as amended and supplemented from time to time.

**7.   *Conditions to the Company's Obligations to Issue and Sell.*** The Company's obligation to issue and sell the Note and Warrant to the Purchaser pursuant to this Agreement is conditioned upon satisfaction of the following conditions precedent on or before the Closing Date (any or all of which may be waived by the Company in its sole discretion):

(a)   On the Closing Date, no legal action, suit or proceeding shall be pending or threatened which seeks to restrain or prohibit the transactions contemplated by this Agreement; and

(b)   The representations and warranties of the Purchaser contained in this Agreement shall have been true and correct on the date of this Agreement and the representations and warranties of the Purchaser contained in the Transaction Documents shall be true and correct on the Closing Date as if given on and as of the Closing Date (except for representations given as of a specific date, which representations shall be true and correct as of such date), and on or before the Closing Date the Purchaser shall have performed all covenants and agreements of the Purchaser contained herein or in any of the other Transaction Documents required to be performed by the Purchaser on or before the Closing Date.

**8.   *Conditions to the Purchaser's Obligations to Purchase.*** The Purchaser's obligations to purchase the Note and Warrant are conditioned upon satisfaction of the following conditions precedent on or before the Closing Date (any or all of which may be waived by the Purchaser in its sole discretion):

(a)   On the Closing Date, no legal action, suit or proceeding shall be pending or threatened which seeks to restrain or prohibit the transactions contemplated by this Agreement;

(b)   The representations and warranties of the Company contained in this Agreement shall have been true and correct on the date of this Agreement and the representations and warranties of the Company contained in the Transaction Documents shall be true and correct on the Closing Date as if given on and as of the Closing Date (except for representations given as of a specific date, which representations shall be true and correct as of such date), and on or before the Closing Date the Company shall have performed all covenants and agreements of the Company contained herein or in any of the other Transaction Documents required to be performed by the Company on or before the Closing Date;

(c)     No event which, if the Note were outstanding, would constitute an Event of Default or which, with the giving of notice or the passage of time, or both, would constitute an Event of Default shall have occurred and be continuing;

(d)     No Change in Control Transaction shall have occurred;

(e)     The Company shall have delivered to the Purchaser a certificate, dated the Closing Date, duly executed by its Chief Executive Officer or Chief Financial Officer, to the effect set forth in subparagraphs (a), (b), (c) and (d) of this Section 8;

(f)     The Company shall have delivered to the Purchaser a certificate, dated the Closing Date, of the Secretary of the Company certifying (A) the Certificate of Incorporation and By-Laws of the Company as in effect on the Closing Date, (B) all resolutions of the Board of Directors (and committees thereof) of the Company relating to this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby and (C) such other matters as reasonably requested by the Purchaser;

(g)     On the Closing Date, the Purchaser shall have received an opinion of counsel for the Company, dated the Closing Date, addressed to the Purchaser, in form, scope and substance reasonably satisfactory to the Purchaser, substantially in the form attached as **Exhibit D**; and

(h)     On the Closing Date, (i) trading in securities on the OTCBB shall not have been suspended or materially limited and (ii) a general moratorium on commercial banking activities in the State of Texas shall not have been declared by either federal or state authorities, nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity or crisis of such magnitude in its effect on, or any material adverse change in any financial market which, in each case, in the good faith judgment of the Purchaser, makes it impracticable or inadvisable to purchase the Note and Warrant.

### 9.     *Miscellaneous.*

**9.1     *Successors and Assigns.*** This Agreement may not be assigned by the Company.  This Agreement may not be assigned by the Purchaser prior to the Closing without the prior written consent of the Company, which consent may not be unreasonably withheld, conditioned or delayed, except that after the Closing, without the prior written consent of the Company, but after notice given to the Company, the Purchaser may assign its rights and delegate its duties hereunder in whole or in part to an Affiliate or to any transferee of Securities from the Purchaser. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties.

Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**9.2  *Counterparts.***  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**9.3  *Titles and Subtitles.***  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**9.4  *Notices.***  Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given only upon delivery to each party to be notified by (i) personal delivery, (ii) telephone line facsimile transmission, upon receipt of confirmation of complete transmittal, or (iii) a recognized overnight air courier, addressed to the party to be notified at the address as follows, or at such other address as such party may designate by ten days' advance written notice to the other party:

        If to the Company:

        Biogentech Corp.
        2445 McCabe Way, Suite 150
        Irvine, California  92614

        Attention:   Chief Executive Officer

        Telephone:  (949) 757-0001
        Fax:        (949) 757-0979

        with a copy to:

        MC Law Group
        4100 Newport Place
        Suite 830
        Newport Beach, CA 92660
        Attention:   Deron M. Colby, Esq.
        Telephone:  (949) 250 8655
        Fax:        (949) 250 8656

        If to the Purchaser, to the address set forth on the signature pages hereto.

-26-

**9.5** *Expenses.* The parties hereto shall pay their own costs and expenses in connection herewith, except that the Company shall pay or reimburse the Purchaser, at or before the Closing, the flat sum of $17,500 for its legal and due diligence expenses incurred in connection with the transactions contemplated by this Agreement. The Company shall pay all fees and expenses of any placement agents in connection with the transactions contemplated by this Agreement pursuant to a separate agreement between such parties.

**9.6** *Amendments and Waivers.* Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Purchaser; *provided, however,* that any such amendment or waiver effected in accordance with this paragraph shall be binding upon each holder of any Securities purchased under this Agreement at the time outstanding, each future holder of all such securities, and the Company.

**9.7** *Severability.* If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**9.8** *Entire Agreement.* This Agreement, including the Exhibits and Schedules hereto, the other Transaction Documents and other documents contemplated hereby and thereby constitute the entire agreement among the parties hereof with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof and thereof.

**9.9** *Survival.* All representations, warranties, covenants and agreements contained in this Agreement shall be deemed to be representations, warranties, covenants and agreements as of the date hereof, except as expressly provided to be made or deemed made as of another date. The representations and warranties shall survive the execution and delivery of, and the Closing under, this Agreement.

**9.10** *Further Assurances.* The parties shall execute and deliver all such further instruments and documents and take all such other actions as may reasonably be required to carry out the transactions contemplated hereby and to evidence the fulfillment of the agreements herein contained.

**9.11 Applicable Law.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada without regard to principles of conflicts of laws.

**9.12 Remedies.**

(a)     The Purchaser shall be entitled to specific performance of the Company's obligations under the Transaction Documents.

(b)     The Company on the one hand and the Purchaser on the other shall indemnify the other and hold it harmless from any loss, cost, expense or fees (including reasonable attorneys' fees and expenses) arising out of any breach of any of its representations, warranties, covenants or agreements in any of the Transaction Documents, or arising out of the enforcement of this Section 9.12.

**9.13 Jurisdiction.** The parties hereby agree that all actions or proceedings arising directly or indirectly from or in connection with this Agreement shall be litigated only in the United States District Court for the Northern District of Texas located in Dallas County, Dallas, Texas. The parties consent and submit to the jurisdiction and venue of the foregoing courts and consent that any process or notice of motion or other application to said court or a judge thereof may be served inside or outside the State of Texas or the Northern District of Texas (but with respect to any party hereto, such consent shall not be deemed a general consent to jurisdiction and service for any third parties) by registered mail, return receipt requested, directed to the party being served at its address provided in or pursuant to this Agreement (and service so made shall be deemed complete three (3) days after the same has been posted as aforesaid) or by personal service or in such other manner as may be permissible under the rules of said court. The Company hereby waives any right to a jury trial in connection with any litigation pursuant to this Agreement.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

THE COMPANY:

BIOGENTECH CORP.

By: _____

Name:   Chaslav Radovich

Title:    CEO and President

**THE PURCHASER:**

**GRYPHON MASTER FUND, L.P.**

By:    Gryphon   Partners,   L.P.,   *its*   *General Partner*

     By:   Gryphon Management Partners, L.P.,
          *its General Partner*

       By:   Gryphon Advisors, LLC,
           *its General Partner*

       By:
           E.B. Lyon, IV, *Authorized Agent*

| | |
|---|---|
| Purchase Price: | $600,000 |
| Number of Warrant Shares: | 90,000 |
| Initial Conversion Price of Note: | $2.00 |
| Initial Exercise Price of Warrant: | $2.88 |

Address for Notices:

Gryphon Master Fund, L.P.
100 Crescent Court, Suite 590
Dallas, Texas 75201
Attn: Ryan R. Wolters
Telephone: (214) 871-6783
Facsimile: (214) 871-6909
E-mail: wolly@gryphonlp.com

with copies to:

Warren W. Garden, P.C.
500 Crescent Court
Suite 270
Dallas, Texas 75201
Attn: Warren W. Garden, Esq.
Telephone: (214) 871-6710
Facsimile: (214) 871-6711

**Exhibit D**

<u>Legal Opinion of Company's Counsel</u>

1.      The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Nevada and has the requisite corporate power to own, lease and operate its properties and assets, and to carry on its business as presently conducted. The Company is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.      The Company has the requisite corporate power and authority to enter into and perform its obligations under the Transaction Documents and to issue the Note, the Underlying Shares, the Warrant and the Warrant Shares. The execution, delivery and performance of each of the Transaction Documents by the Company and the consummation by it of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate action and no further consent or authorization of the Company or its Board of Directors is required. Each of the Transaction Documents have been duly executed and delivered, and the Note and the Warrant have been duly executed, issued and delivered by the Company and each of the Transaction Documents constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its respective terms. The Underlying Shares and the Warrant Shares are not subject to any preemptive rights under the Certificate or the Bylaws.

3.      The Underlying Shares have been duly authorized and reserved for issuance, and, when delivered upon conversion of the Note, will be validly issued, fully paid and nonassessable. The Warrant Shares have been duly authorized and reserved for issuance, and, when delivered upon exercise or against payment in full as provided in the Warrant, will be validly issued, fully paid and nonassessable.

4.      The execution, delivery and performance of and compliance with the terms of the Transaction Documents and the issuance of the Note, the Underlying Shares, the Warrant and the Warrant Shares do not (a) violate any provision of the Company's Articles of Incorporation or Bylaws, (b) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any material agreement, mortgage, deed of trust, indenture, note, bond, license, lease agreement, instrument or obligation to which the Company is a party and which is known to us, (c) create or impose any Encumbrance on any property of the Company under any agreement or any commitment known to us to which the Company is a party or by which the Company is bound or by which any of its respective properties or assets are bound, or (d) result in a violation of any

Federal, state, local or foreign statute, rule, regulation, order, judgment, injunction or decree (including Federal and state securities laws and regulations) applicable to the Company or by which any property or asset of the Company is bound or affected, except, in all cases other than violations pursuant to clauses (a) and (d) above, for such conflicts, default, terminations, amendments, acceleration, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect.

5.      No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required under Federal, state or local law, rule or regulation in connection with the valid execution, delivery and performance of the Transaction Documents, or the offer, sale or issuance of the Note, the Underlying Shares, the Warrant or the Warrant Shares other than filings as may be required by applicable Federal and state securities laws and regulations and the OTCBB rules and regulations.

6.      To our knowledge, there is no action, suit, claim, investigation or proceeding pending or threatened against the Company which questions the validity of the Agreement or the transactions contemplated thereby or any action taken or to be taken pursuant thereto. There is no action, suit, claim, investigation or proceeding pending, or to our knowledge, threatened, against or involving the Company or any of its properties or assets and which, if adversely determined, is reasonably likely to result in a Material Adverse Effect. There are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against the Company or any officers or directors of the Company in their capacities as such.

7.      The offer, issuance and sale of the Note and the Warrant and the offer, issuance and sale of the Underlying Shares and the Warrant Shares pursuant to the Purchase Agreement and the Warrant, as applicable, are exempt from the registration requirements of the 1933 Act.

8.      The Company is not, and as a result of and immediately upon Closing will not be, an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

**Schedule 3.1**        Corporate Structure

Parent:  BioGentech Corp, a Nevada corporation.

Subsidiaries:

BioGentec Incorporated, a Nevada corporation

InnoFood Incorporated – proposed acquisition; not closed



# PURCHASE AGREEMENT

### dated as of September 25, 2003

### by and between

## BIOGENTECH CORP.

### and

## GRYPHON MASTER FUND, L.P.

---

### 7.5% CONVERTIBLE PREFERRED STOCK

### and

## COMMON STOCK PURCHASE WARRANT



# BIOGENTECH CORP.

## PURCHASE AGREEMENT

### 7.5% CONVERTIBLE PREFERRED STOCK

### and

### COMMON STOCK PURCHASE WARRANT

## TABLE OF CONTENTS

**Page**

1. Definitions. .................................................................................1
2. Purchases and Sales of the Shares and Warrant. .................................6
   2.1  Purchase and Sale. ..............................................................6
   2.2  Payment. .............................................................................6
   2.3  Closing. ..............................................................................7
3. Representations and Warranties of the Company. ................................7
   3.1  Organization, Good Standing and Qualification .........................7
   3.2  Authorization. ......................................................................7
   3.3  Capitalization. .....................................................................8
   3.4  Valid Issuance. ....................................................................8
   3.5  Consents. ............................................................................8
   3.6  Delivery of SEC Filings; Business; Non-Public Information. ........9
   3.7  Use of Proceeds. .................................................................9
   3.8  No Material Adverse Change. ................................................9
   3.9  Registration Statements. .....................................................10
   3.10 Form S-3 Eligibility. ...........................................................10
   3.11 No Conflict, Breach, Violation or Default. .............................10
   3.12 Tax Matters. ......................................................................11
   3.13 Title to Properties. .............................................................11
   3.14 Certificates, Licenses, Authorizations and Permits. ................12
   3.15 No Labor Disputes. ............................................................12
   3.16 Intellectual Property. .........................................................12
   3.17 Environmental Matters. ......................................................13
   3.18 Litigation. ..........................................................................13
   3.19 Financial Statements. .........................................................13
   3.20 Insurance Coverage. ..........................................................14
   3.21 Sarbanes-Oxley ................................................................14
   3.22 Acknowledgement of Potential Dilution .................................14
   3.23 Brokers and Finders. ..........................................................14

   3.24   No Directed Selling Efforts or General Solicitation. ..................14
   3.25   No Integrated Offering.................................................................14
   3.26   Disclosures....................................................................................15
   3.27   Absence of Rights Agreement.....................................................15
4.   Representations and Warranties of the Purchaser. ...........................15
   4.1    Organization and Existence........................................................15
   4.2    Purchase Entirely for Own Account. .........................................15
   4.3    Investment Experience. ..............................................................15
   4.4    Disclosure of Information. ..........................................................15
   4.5    Restricted Securities. ..................................................................16
   4.6    Accredited Investor. ....................................................................16
   4.7    No General Solicitation...............................................................16
   4.8    Residency of Purchaser...............................................................16
   4.9    Brokers and Finders. ...................................................................16
   4.10   Authorization................................................................................16
   4.11   Risk Factors.................................................................................16
   4.12   Reliance. .......................................................................................16
   4.13   No Representations. .....................................................................17
   4.14   Survival. .......................................................................................17
5.   Registration Rights Agreement. .........................................................17
   5.1    Registration Rights Agreement. .................................................17
6.   Certain Covenants of the Company and the Purchaser.......................17
   6.1    19.99% Cap; Rule 144. ...............................................................17
   6.2    Limitation on Certain Transactions............................................18
   6.3    Right of the Purchaser to Participate in Future Transactions. .18
   6.4    Reports and Information..............................................................20
   6.5    Press Releases. ............................................................................21
   6.6    No Conflicting Agreements.........................................................21
   6.7    Insurance. .....................................................................................21
   6.8    Compliance with Laws................................................................22
   6.9    Listing of Underlying Shares and Warrant
            Shares and Related Matters.......................................................22
   6.10   Corporate Existence. ...................................................................22
   6.11   Form 8-K.......................................................................................23
   6.12   Legends.........................................................................................23
7.   Conditions to the Company's Obligations to Issue and Sell. .................24
8.   Conditions to the Purchaser's Obligations to Purchase.......................25
9.   Miscellaneous......................................................................................26
   9.1    Successors and Assigns...............................................................26
   9.2    Counterparts. ...............................................................................26
   9.3    Titles and Subtitles. ....................................................................26
   9.4    Notices..........................................................................................26
   9.5    Expenses. .....................................................................................27
   9.6    Amendments and Waivers...........................................................27

9.7     Severability...................................................................................27
9.8     Entire Agreement..........................................................................27
9.9     Survival. ........................................................................................28
9.10    Further Assurances.......................................................................28
9.11    Applicable Law. ............................................................................28
9.12    Remedies........................................................................................28
9.13    Jurisdiction...................................................................................28

## EXHIBITS

Exhibit A – Form of Certificate of Designation of Rights and Preferences of 7.5%
              Convertible Preferred Stock
Exhibit B – Form of Warrant
Exhibit C – Form of Registration Rights Agreement

## PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** dated as of September 25, 2003 (this "Agreement"), by and between **BIOGENTECH CORP.**, a Nevada corporation (the "Company"), and **GRYPHON MASTER FUND, L.P.**, a Bermuda limited partnership (the "Purchaser").

## W I T N E S S E T H:

**WHEREAS,** the Purchaser wishes to purchase from the Company, and the Company wishes to sell and issue to the Purchaser, upon the terms and subject to the conditions of this Agreement, (i) 1,000 shares of the Company's 7.5% Convertible Preferred Stock, par value $0.001 per share (the "Shares"), and (ii) a Warrant initially entitling the holder to purchase an aggregate of 104,167 shares of Common Stock for the Purchase Price; and

**WHEREAS,** at or before the Closing, the parties hereto are executing and delivering, one to the other, the Registration Rights Agreement, pursuant to which, among other things, the Company will agree to provide certain registration rights under the 1933 Act, and the rules and regulations promulgated thereunder, and applicable state securities laws for the resale of the shares of Common Stock issuable upon conversion of the Shares and issuable upon exercise of the Warrant.

**NOW THEREFORE,** in consideration of the premises and the mutual covenants made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### 1. *Definitions.*

1.1   As used in this Agreement, the terms "Agreement", "Company" and "Purchaser" shall have the respective meanings assigned to such terms in the introductory paragraph of this Agreement.

1.2   All the agreements or instruments herein defined shall mean such agreements or instruments as the same may from time to time be supplemented or amended or the terms thereof waived or modified to the extent permitted by, and in accordance with, the terms thereof and of this Agreement.

1.3   The following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the subject Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Aggregation Parties" shall have the meaning provided in Section 6.3(b).

"AMEX" means the American Stock Exchange, Inc.

"Approved Markets" shall have the meaning provided in Section 6.9.

"Board of Directors" means the Board of Directors of the Company.

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks in the City of Dallas are authorized or required by law or executive order to remain closed.

"Certificate of Designation" means the Certificate of Designation of Rights and Preferences of 7.5% Convertible Preferred Stock in the form attached as **Exhibit A**.

"Change in Control Transaction" shall will be deemed to exist if (i) there occurs any consolidation, merger, amalgamation or other business combination of the Company with or into any other corporation or other entity or person (whether or not the Company is the surviving corporation), or any other corporate reorganization or transaction or series of related transactions in which in any of such events the persons who are holders of the voting stock of the Company immediately prior to such event cease to own 50% or more of the voting stock, or corresponding voting equity interests, of the surviving corporation or other entity immediately after such event (including without limitation any "going private" transaction under Rule 13e-3 promulgated pursuant to the 1934 Act or tender offer by the Company under Rule 13e-4 promulgated pursuant to the 1934 Act for 20% or more of the Common Stock), (ii) any person (as defined in Section 13(d) of the 1934 Act), together with its affiliates and associates (as such terms are defined in Rule 405 under the 1933 Act), beneficially owns or is deemed to beneficially own (as described in Rule 13d-3 under the 1934 Act without regard to the 60-day exercise period) in excess of 50% of the voting power of the Company's outstanding securities, (iii) there is a replacement of more than one-half of the members of the

Board of Directors which is not approved by those individuals who are members of the Board of Directors on the date thereof, or (iv) in one or a series of related transactions, there is a sale or transfer of all or substantially all of the assets of the Company, determined on a consolidated basis.

"Closing" means the closing of the purchase and sale of the Shares and Warrant on the Closing Date.

"Closing Date" means 10 a.m., Dallas, Texas time, on September 25, 2003, or such other time or date as mutually agreed by the parties hereto.

"Closing Location" means 100 Crescent Court, Suite 590, Dallas, Texas 75201.

"Common Stock" means the Common Stock, $.001 per share, of the Company.

"Common Stock Equivalent" means any warrant, option, subscription or purchase right with respect to shares of Common Stock, any security convertible into, exchangeable for, or otherwise entitling the holder thereof to acquire, shares of Common Stock or any warrant, option, subscription or purchase right with respect to any such convertible, exchangeable or other security.

"Encumbrances" means all mortgages, deeds of trust, claims, security interests, liens, pledges, leases, subleases, charges, escrows, options, proxies, rights of occupancy, rights of first refusal, preemptive rights, covenants, conditional limitations, hypothecations, prior assignments, easements, title retention agreements, indentures, security agreements or any other encumbrances of any kind.

"Environmental Law" shall have the meaning provided in Section 3.17.

"Excluded Shares" shall have the meaning provided in Section 6.3(b).

"Generally Accepted Accounting Principles" means, for any Person, the United States generally accepted accounting principles and practices applied by such Person from time to time in the preparation of its audited financial statements.

"Intellectual Property" means all franchises, patents, trademarks, service marks, tradenames (whether registered or unregistered), copyrights, corporate names, licenses, trade secrets, proprietary software or hardware, proprietary technology, technical information, discoveries, designs and other proprietary rights, whether or not patentable, and confidential information

(including, without limitation, know-how, processes and technology) used in the conduct of the business of the Company or any Subsidiary, or in which the Company or any Subsidiary has an interest.

"Material Adverse Effect" means a material adverse effect on the (i) business, properties, operations, condition (financial or other), results of operations or prospects of the Company and the Subsidiaries, taken as a whole; (ii) the validity or enforceability of, or the ability of the Company to perform its obligations under, the Transaction Documents; or (iii) rights and remedies of the Purchaser under the terms of the Transaction Documents.

"Nasdaq" means the Nasdaq National Market.

"Nasdaq Small Cap" means the Nasdaq Small Cap Market.

"1934 Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"1933 Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"NYSE" means the New York Stock Exchange, Inc.

"OTCBB" means the OTC Bulletin Board.

"Person" means an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, pool, syndicate, sole proprietorship, unincorporated organization, governmental authority or any other form of entity not specifically listed herein.

"Purchase Price" means the amount shown on the signature pages to this Agreement as the Purchaser's Purchase Price.

"Purchaser Share Notice" shall have the meaning provided in Section 6.12.

"Registration Rights Agreement" means the Registration Rights Agreement by and between the Company and the Purchaser in the form attached as **Exhibit C**.

"Registration Statement" shall have the meaning provided in the Registration Rights Agreement.

"Regulation D" means Regulation D adopted by the SEC under the 1933 Act.

"Restricted Ownership Percentage" shall have the meaning provided in Section 6.3(b).

"SEC" means the U.S. Securities and Exchange Commission.

"SEC Filings" means the Company's Annual Report on Form 10-KSB for the fiscal year ended December 31, 2002 and all other reports filed by the Company pursuant to Section 13 or 15(d) of the 1934 Act since December 31, 2002.

"Securities" means the Shares, the Underlying Shares, the Warrant and the Warrant Shares.

"Shares" means the shares of 7.5% Convertible Preferred Stock of the Company being purchased by the Purchaser pursuant to this Agreement.

"Subsidiary" means any corporation or other entity of which a majority of the capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by the Company.

"Transaction Documents" means this Agreement, the Registration Rights Agreement, the Certificate of Designation and the Warrant.

"20% Cap" shall have the meaning provided in Section 6.1(a).

"2002 10-K" means the Company's Annual Report on Form 10-KSB for the fiscal year ended December 31, 2002, as filed as the SEC.

"Underlying Shares" means the shares of Common Stock issued or issuable upon conversion of the Shares.

"Variable Rate Transaction" means a transaction in which the Company issues or sells any Common Stock or Common Stock Equivalent (a) that is convertible into, exchangeable or exercisable for, or includes the right to receive additional shares of Common Stock either (x) at a conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for the Common Stock at any time after the initial issuance of such debt or equity securities, or (y) with a fixed conversion, exercise, exchange or purchase price that is subject to being reset at some future date after the initial issuance of Common Stock or Common Stock Equivalent or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or

the market for the Common Stock (but excluding standard stock split, reverse stock split and stock dividend anti-dilution provisions), or (b) pursuant to an "equity line" structure which provides for the sale, from time to time, of securities of the Company which are registered for sale or resale pursuant to the 1933 Act.

"Warrant" means the Company's Common Stock Purchase Warrant in the form attached hereto as **Exhibit B**.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of or otherwise pursuant to the Warrant.

## 2.    *Purchases and Sales of the Shares and Warrant.*

**2.1    *Purchase and Sale.*** Upon the terms and subject to the conditions of this Agreement, the Purchaser hereby agrees to purchase from the Company, and the Company hereby agrees to sell to the Purchaser, on the Closing Date, the Shares and the Warrant for the Purchase Price. The Shares shall have such powers, preferences and rights, and the qualifications, limitations or restrictions thereof, as set forth in the Certificate of Designation in the form attached hereto as **Exhibit A**, subject to the applicable terms and conditions of this Agreement and the Registration Rights Agreement.

**2.2    *Payment.*** Payment by the Purchaser of the Purchase Price to the Company at the Closing on the Closing Date shall be made as follows:

(a)    the Purchaser shall pay to Warren W. Garden, P.C. an amount equal to $15,000 payable by the Company pursuant to Section 9.5, by wire transfer of immediately available funds to an account designated by such firm;

(b)    the Purchaser shall pay to CK Cooper & Company an amount equal to $100,000 payable by the Company to such firm as a finder, by wire transfer of immediately available funds to an account designated by such firm; and

(c)    Purchaser shall pay to the Company the balance of the Purchase Price, after determination and deduction therefrom of the amounts to be paid pursuant to Sections 2.2(a) and (b), by wire transfer of immediately available funds to an account designated by the Company.

(d)    For all purposes, upon payment of the amounts provided for in this Section 2.2, the Purchaser shall be deemed to have paid the Purchase Price in full to the Company and to have disbursed on behalf of the Company the amounts provided in Sections 2.2(a) and (b). By agreeing to disburse funds on behalf of the Company as provided in this Section 2.2, in no event shall the Purchaser have any liability to any Person, including, without limitation, the Persons identified in

Sections 2.2(a) and (b), for payment or performance of any obligation or liability of the Company to such Person.

   **2.3    Closing.** The sale and purchase of the Shares and Warrant shall occur on the Closing Date at the Closing Location. At the Closing on the Closing Date, upon the terms and subject to the conditions of this Agreement,

      (A)    the Company shall issue and sell to the Purchaser the Shares and the Warrant upon payment by the Purchaser to the Company of an amount equal to the Purchase Price as provided in Section 2.2, and

      (B)    the Purchaser shall pay to the Company an amount equal to the Purchase Price, as provided in Section 2.2, against issuance and sale by the Company to the Purchaser of the Shares and Warrant.

   **3.    Representations and Warranties of the Company.** The Company hereby represents and warrants to, and covenants and agrees with, the Purchaser that:

   **3.1    Organization, Good Standing and Qualification.** The Company and each Subsidiary is a corporation duly incorporated, validly existing and subsisting under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority to carry on its business as now conducted and to own its properties. The Company and each Subsidiary is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property makes such qualification or licensing necessary unless the failure to so qualify would not be reasonably likely to result in a Material Adverse Effect. The Company has no Subsidiaries other than those listed in **Schedule 3.1** and has no investment in any other Person except such investments as would be classified as current assets on a balance sheet of the Company, prepared in accordance with Generally Accepted Accounting Principles.

   **3.2    Authorization.** The Company has full corporate power and authority and has taken all requisite action on the part of the Company, its officers, directors and stockholders necessary for (i) the authorization, execution and delivery of the Transaction Documents, (ii) the authorization of the performance of all obligations of the Company under the Transaction Documents, and (iii) the authorization, issuance (or reservation for issuance) and delivery of the Securities. The Transaction Documents constitute the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability, relating to or affecting creditors' rights generally.

**3.3   Capitalization.** Set forth on **Schedule 3.3** hereto is (a) the authorized capital stock of the Company on the date hereof; (b) the number of shares of capital stock issued and outstanding on the date hereof; (c) the number of shares of capital stock issuable pursuant to the Company's stock option, stock purchase, stock award and similar plans; and (d) the number of shares of capital stock issuable and reserved for issuance pursuant to all Common Stock Equivalents outstanding or which the Company has agreed to issue (other than the Shares and the Warrant). All of the issued and outstanding shares of the Company's capital stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights. No Person is entitled to preemptive or similar statutory or contractual rights with respect to any securities of the Company. Except as set forth on **Schedule 3.3** or in the SEC Filings, there are no outstanding Common Stock Equivalents or other rights, agreements or arrangements of any character under which the Company is or may be obligated to issue any equity securities of any kind, and except as contemplated by this Agreement, the Company is not currently in negotiations for the issuance of any Common Stock Equivalents or capital stock of any kind. The Company has no knowledge of any voting agreements, buy-sell agreements, option or right of first purchase agreements or other agreements of any kind among any of the security holders of the Company relating to the securities of the Company held by them. Except as set forth on **Schedule 3.3** and except for registration statements currently on file, the Company has not granted any Person the right (which is now outstanding or effective) to require the Company to register any securities of the Company under the 1933 Act, whether on a demand basis or in connection with the registration of securities of the Company for its own account or for the account of any other Person.

**3.4   Valid Issuance.** The aggregate number of shares of Common Stock issued, outstanding is 26,364,708 and reserved for issuance is 2,052,500. The Company does not have any obligation to issue shares of Common Stock for which it has not reserved an adequate number of shares of Common Stock. The Shares and Warrant are duly authorized, and such Securities, and the Underlying Shares issuable upon conversion of the Shares and Warrant Shares issuable upon exercise of the Warrant, have been duly authorized and when issued in accordance herewith and with the terms of the Certificate of Designation and the Warrant, will be validly issued, fully paid, non-assessable and free and clear of all Encumbrances and restrictions, except for restrictions on transfer imposed by applicable securities laws.

**3.5   Consents.** The execution, delivery and performance by the Company of the Transaction Documents and the offer, issuance and sale of the Securities require no consent of, action by or in respect of, or filing with, any Person, governmental body, agency, or official other than filings that have been or will be made pursuant to applicable state securities laws and the requirements of

-8-

the OTCBB and other than the filing of a Form D by the Company with the SEC, each of which the Company undertakes to file within the applicable time periods.

**3.6 Delivery of SEC Filings; Business; Non-Public Information.** The Company has timely filed all material reports and other documents required to be filed with the SEC pursuant to the 1934 Act since December 31, 1999. At their respective times of filing with the SEC, the SEC Filings complied in all material respects with the requirements of the 1934 Act and did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. The Company and the Subsidiaries are engaged only in the business described in the SEC Filings, and the SEC Filings contain a complete and accurate description of the business of the Company and the Subsidiaries. The Company has not provided to the Purchaser (i) any information required to be filed under the 1934 Act that has not been so filed or (ii) any material non-public information concerning the Company and the Subsidiaries.

**3.7 Use of Proceeds.** The proceeds of the sale of the Shares and the Warrant hereunder shall be used by the Company for working capital purposes.

**3.8 No Material Adverse Change.** Since the filing of the 2002 10-K or as otherwise identified and described in the SEC Filings subsequently filed by the Company with the SEC pursuant to the 1934 Act there has not been:

(i) any material change in the consolidated assets, liabilities, financial condition or operating results of the Company and the Subsidiaries from that reflected in the financial statements included in the 2002 10-K, except changes in the ordinary course of business which have not had, in the aggregate, a Material Adverse Effect;

(ii) any declaration or payment of any dividend, or any authorization or payment of any distribution, on any of the capital stock of the Company, or any redemption or repurchase of any securities of the Company or any Subsidiary;

(iii) any material damage, destruction or loss, whether or not covered by insurance, to any assets or properties of the Company or any Subsidiary;

(iv) any waiver by the Company or any Subsidiary of a material right or of a material debt owed to it which waiver is adverse to the Company or any Subsidiary;

(v)   any satisfaction or discharge of any Encumbrance or payment of any obligation by the Company or any Subsidiary, except in the ordinary course of business and which is not material to the assets, properties, prospects, financial condition, operating results or business of the Company and the Subsidiaries taken as a whole (as such business is presently conducted and the Company has publicly disclosed it is proposed to be conducted);

(vi)   any material change or amendment to a material contract or arrangement by which the Company or any Subsidiary or any of their respective assets or properties is bound or subject;

(vii)   any material labor difficulties or labor union organizing activities with respect to employees of or contractors to the Company or any Subsidiary;

(viii)   any transaction entered into by the Company or any Subsidiary other than in the ordinary course of business; or

(ix)   any other event or condition of any character that may have a Material Adverse Effect.

**3.9    Registration Statements.** During the preceding two years, each registration statement and any amendment thereto filed by the Company pursuant to the 1933 Act, as of the date such registration statement or amendment became effective, complied as to form in all material respects with the 1933 Act, and did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading; and each prospectus or supplement filed pursuant to Rule 424 under the 1933 Act, as of its issue date and as of the closing of any sale of securities pursuant thereto did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

**3.10    Form S-3 Eligibility.** The Company is currently eligible to register the resale of its Common Stock in a secondary offering on a registration statement on Form S-3 under the 1933 Act and the Company shall maintain such eligibility at least until the Registration Statement is ordered effective by the SEC.

**3.11    No Conflict, Breach, Violation or Default.** (a) The execution, delivery and performance of the Transaction Documents by the Company and the issuance and sale of the Securities will not conflict with or result in a breach or violation of any of the terms and provisions of, or constitute a default

-10-

under (i) the Company's Articles of Incorporation (including any articles of amendment or articles designating series of shares) or the Company's Bylaws, both currently in effect (copies of which have been provided to the Purchaser before the date hereof) and as in effect on the date of issuance of the Securities, (ii) any statute, rule, regulation or order of any governmental agency or body or any court, domestic or foreign, having jurisdiction over the Company or any Subsidiary or any of their respective assets or properties, or (iii) any agreement or instrument to which the Company or any Subsidiary is a party or by which the Company or any Subsidiary is bound or to which any of the properties of the Company or any Subsidiary is subject.

(b)     Except where it would not have a Material Adverse Effect, the Company and each Subsidiary (i) is not in violation of any statute, rule or regulation applicable to the Company or any Subsidiary or its assets, (ii) is not in violation of any judgment, order or decree applicable to the Company or any Subsidiary or any of their respective assets, and (iii) is not in breach or violation of any agreement, note or instrument to which it or its assets are a party or are bound or subject. To the best of the Company's knowledge, neither the Company nor any Subsidiary has received notice from any Person of any claim or investigation that, if adversely determined, would render the preceding sentence untrue or incomplete.

**3.12    Tax Matters.** The Company and the Subsidiaries have timely prepared and filed all tax returns required to have been filed by the Company with all appropriate governmental agencies and timely paid all taxes owed by them, except where failure to make such payment would not have a Material Adverse Effect. The charges, accruals and reserves on the books of the Company and the Subsidiaries in respect of taxes for all fiscal periods are adequate in all material respects, and there are no material unpaid assessments against the Company or any Subsidiary nor, to the knowledge of the Company, any basis for the assessment of any additional taxes, penalties or interest for any fiscal period or audits by any foreign, U.S. federal, state, representations or warranties in or local taxing authority, except such as are not material.    All material taxes and other assessments and levies that the Company or any Subsidiary is required to withhold or to collect for payment have been duly withheld and collected and paid to the proper governmental entity or third party when due.    There are no tax liens or claims pending or threatened against the Company or any Subsidiary or any of their respective assets or property which if adversely decided, would have a Material Adverse Effect.    There are no outstanding tax sharing agreements or other such arrangements between the Company or any Subsidiary and any other Person.

**3.13    Title to Properties.** Except as disclosed in the SEC Filings, the Company and each Subsidiary has good and marketable title to all real properties and all other properties and assets owned by it, in each case free from Encumbrances and defects that would materially affect the value thereof or

-11-

materially interfere with the use made or currently planned to be made thereof by the Company or such Subsidiary; and except as disclosed in the SEC Filings, the Company and each Subsidiary holds any leased real or personal property under valid and enforceable leases with no exceptions that would materially interfere with the use made or currently planned to be made thereof by the Company or such Subsidiary.

**3.14 *Certificates, Licenses, Authorizations and Permits.*** The Company and each Subsidiary possesses adequate certificates, licenses, authorizations or permits issued by appropriate governmental agencies or bodies necessary to conduct the business now operated by it and has not received any notice of proceedings relating to the revocation or modification of any such certificate, license, authorization or permit that, if determined adversely to the Company or any Subsidiary, would individually or in the aggregate have a Material Adverse Effect.

**3.15 *No Labor Disputes.*** No material labor dispute with the employees of or contractors to the Company or any Subsidiary exists or, to the knowledge of the Company, is imminent.

**3.16 *Intellectual Property.*** (1) The Company and each Subsidiary holds all Intellectual Property, free and clear of all Encumbrances and restrictions on use or transfer, whether or not recorded, and has sole title to and ownership of or has the full, exclusive (subject to the rights of its licensees or licensors) right to use in its field of business, for the life of the proprietary right all Intellectual Property; (2) the use of the Intellectual Property by the Company or any Subsidiary does not, to the knowledge of the Company after due inquiry, violate or infringe on the rights of any other Person; (3) neither the Company nor any Subsidiary has received any notice of any conflict between the asserted rights of others and the Company or any Subsidiary with respect to any Intellectual Property; (4) the Company and each Subsidiary has used its best efforts to perfect its rights in and to all Intellectual Property used by it in its business or in which it has an interest; (5) the Company and each Subsidiary are in compliance with all material terms and conditions of its agreements relating to the Intellectual Property; (6) neither the Company nor any Subsidiary is or has been a defendant in any action, suit, investigation or proceeding relating to infringement or misappropriation by the Company or any Subsidiary of any Intellectual Property; (7) neither the Company nor any Subsidiary has been notified of any alleged claim of infringement or misappropriation by the Company or any Subsidiary of any Intellectual Property; (8) the Company has no knowledge of any claim of infringement or misappropriation by the Company or any Subsidiary of any Intellectual Property; (9) to the knowledge (after due inquiry) of the Company, none of the products the Company and the Subsidiaries are researching, developing, propose to research and develop, make, have made, use, or sell, infringes or misappropriates any

Intellectual Property right of any third party; (10) none of the trademarks and service marks used by the Company or any Subsidiary, to the knowledge of the Company after due inquiry, infringes the trademark or service mark rights of any third party; (11) to the Company's knowledge none of the material processes and formulae, research and development results and other know-how relating to the Company's or the Subsidiaries' respective businesses, the value of which to the Company or any Subsidiary is contingent upon maintenance of the confidentiality thereof, has been disclosed to any Person other than Persons bound by written confidentiality agreements; and (12) the Company owns directly, or possesses adequate rights to use, all Intellectual Property used in or relating to the development, manufacture, use, distribution or marketing of the Company's products, and none of such Intellectual Property is owned, claimed or used by, or subject to any Encumbrance of or by, any Subsidiary.

**3.17  *Environmental Matters.*** Neither the Company nor any Subsidiary is in violation of any statute, rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, "Environmental Laws"), does not own or operate any real property contaminated with any substance that is subject to any Environmental Laws, is not liable for any off-site disposal or contamination pursuant to any Environmental Laws, and is not subject to any claim relating to any Environmental Laws, which violation, contamination, liability or claim would individually or in the aggregate have a Material Adverse Effect; and neither the Company nor any Subsidiary is aware of any pending investigation that might lead to such a claim.

**3.18  *Litigation.*** Except as set forth in the SEC Filings, there are no pending actions, suits or proceedings against or affecting the Company or any Subsidiary or any of their respective properties that, if determined adversely to the Company or such Subsidiary, would individually or in the aggregate have a Material Adverse Effect, or which are otherwise material in the context of the sale of the Securities; and to the Company's knowledge, no such actions, suits or proceedings are threatened or contemplated.

**3.19  *Financial Statements.*** The consolidated financial statements included in each SEC Filing present fairly and accurately in all material respects the consolidated financial position of the Company and the Subsidiaries as of the dates reported and the consolidated results of operations, changes in stockholders' equity and cash flows for the periods reported, all in conformity with Generally Accepted Accounting Principles applied on a consistent basis and in conformity with the rules and regulations of the SEC under the 1934 Act applicable to the Company. Except as set forth in the consolidated financial statements of the Company included in the SEC Filings filed prior to the date hereof, neither the Company nor

any Subsidiary has any liabilities, contingent or otherwise, except those which individually or in the aggregate are not material to the financial condition or operating results of the Company and the Subsidiaries, taken as a whole.

**3.20 *Insurance Coverage.*** The Company and each Subsidiary maintains in full force and effect insurance coverage that is customary for comparably situated companies for the business being conducted and properties owned or leased by it, and the Company reasonably believes such insurance coverage to be adequate against all liabilities, claims and risks against which it is customary for comparably situated companies to insure.

**3.21 *Sarbanes-Oxley.*** The Company is in compliance with any and all applicable requirements of the Sarbanes-Oxley Act of 2002 that are effective as of the date hereof, and any and all applicable rules and regulations promulgated by the SEC thereunder that are effective as of the date hereof, except where such noncompliance would not have, individually or in the aggregate, a Material Adverse Effect.

**3.22 *Acknowledgement of Potential Dilution.*** The Company understands that the number of shares of Common Stock issuable upon conversion of the Shares and exercise of the Warrant may increase substantially and that such increase may have a dilutive effect on the Company's equity capitalization.

**3.23 *Brokers and Finders.*** The Purchaser shall have no liability or responsibility for the payment of any commission or finder's fee to any third party in connection with or resulting from this Agreement or the transactions contemplated by this Agreement by reason of any agreement of or action taken by the Company.

**3.24 *No Directed Selling Efforts or General Solicitation.*** Notwithstanding anything contained on any schedule hereto, neither the Company nor any Person acting on its behalf has conducted any general solicitation or general advertising (as those terms are used in Regulation D) in connection with the offer or sale of any of the Securities.

**3.25 *No Integrated Offering.*** Neither the Company nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would (1) adversely affect reliance by the Company on Section 4(2) of the 1933 Act for the exemption from registration for the transactions contemplated hereby or would require registration of the offer and sale of the Shares and Warrant to the Purchaser under the 1933 Act; or (2) require the integration of the offering of the Securities with any other offering of securities for

purposes of determining the need to obtain stockholder approval of the transactions contemplated hereby under the rules of the OTCBB.

**3.26 _Disclosures._** For purposes of this Agreement and the transactions contemplated hereby, none of the representations or warranties made by the Company under any of the Transaction Documents and no written information furnished by the Company pursuant hereto, or in any other document, certificate or written statement furnished by the Company to the Purchaser or any authorized representative of the Purchaser, pursuant to the Transaction Documents or in connection therewith, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which they were made, not misleading.

**3.27 _Absence of Rights Agreement._** The Company has not adopted a shareholder rights plan or similar arrangement relating to accumulations of beneficial ownership of Common Stock or a change of control in the Company.

**_4. Representations and Warranties of the Purchaser._** The Purchaser hereby represents and warrants to the Company that:

**4.1 _Organization and Existence._** Such Purchaser is a validly existing partnership and has all requisite partnership power and authority to invest in the Securities pursuant to this Agreement.

**4.2 _Purchase Entirely for Own Account._** The Securities to be acquired by the Purchaser pursuant to this Agreement will be acquired for the Purchaser's own account, not as nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of applicable securities laws, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same in violation of applicable securities laws.

**4.3 _Investment Experience._** The Purchaser acknowledges that it can bear the economic risk and complete loss of its investment in the Securities and has such knowledge of and experience with securities and financial or business matters that it is capable of evaluating the merits and risks of the purchase of the Shares and Warrant.

**4.4 _Disclosure of Information._** The Purchaser has had an opportunity to review documents related to the Company and to ask questions of and receive answers from the Company regarding the terms and conditions of the offering of the Securities; _provided however,_ that neither such inquiries nor any other investigation conducted by the Purchaser shall modify, amend, limit or otherwise affect the Purchaser's right to rely on the Company's representations and

-15-

warranties contained in the Transaction Documents or made pursuant to the Transaction Documents.

   **4.5    Restricted Securities.** The Purchaser understands that the Shares and Warrant are characterized as "restricted securities" under the U.S. federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the 1933 Act only in certain limited circumstances.

   **4.6    Accredited Investor.** The Purchaser is an "accredited investor" as defined in Rule 501(a) of Regulation D.

   **4.7    No General Solicitation.** The Purchaser did not learn of the offering of the Shares and Warrant through any public advertising or general solicitation (as these terms are used in Regulation D).

   **4.8    Residency of Purchaser.** The Purchaser is a resident of the state or other jurisdiction indicated in the first paragraph of this Agreement.

   **4.9    Brokers and Finders.** The Company shall have no liability or responsibility for the payment of any commission or finder's fee to any third party in connection with ° or resulting from this Agreement or the transactions contemplated by this Agreement by reason of any agreement of the Purchaser.

   **4.10    Authorization.** The Purchaser has full partnership power and authority and has taken all requisite action on the part of the Purchaser and its partners necessary for (i) the authorization, execution and delivery of the Transaction Documents and (ii) the authorization of the performance of all obligations of the Purchaser under the Transaction Documents. The Transaction Documents constitute the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability, relating to or affecting creditors' rights generally.

   **4.11    Risk Factors.** Without limiting any of the Purchaser's other representations and warranties hereunder, the Purchaser acknowledges that the Purchaser has reviewed and is aware of the risk factors described in the SEC Filings.

   **4.12    Reliance.** The Purchaser has consulted its own financial, legal and tax advisors with respect to the economic, legal and tax consequences of an investment in the Shares and Warrant and has not relied on the SEC Filings or the Company, its officers, directors or professional advisors as to such consequences.

**4.13   *No Representations.*** No oral representations have been made by the Company to the Purchaser in connection with the Transaction Documents; and no written representations have been made by the Company to the Purchaser other than as stated in the Transaction Documents and the SEC Filings.

**4.14   *Survival.*** The Purchaser acknowledges that the representations, warranties and agreements made by the Purchaser herein shall survive the execution and delivery of this Agreement and the purchase of the Shares and Warrant.

## 5.   *Registration Rights Agreement.*

**5.1   *Registration Rights Agreement.*** The Company acknowledges and agrees that the Company's execution and delivery of, and full performance of its obligations under, the Registration Rights Agreement is a material inducement to the Purchaser to execute and deliver this Agreement and purchase and pay for the Shares and Warrant. The Company agrees to execute and deliver to the Purchaser the Registration Rights Agreement at or before the Closing.

## 6.   *Certain Covenants of the Company and the Purchaser.*

**6.1   *19.99% Cap; Rule 144.***

**(a)   *19.99% Cap.*** Notwithstanding anything contained herein or in the other Transaction Documents, if Rule 4350(i)(1)(D) of the Nasdaq is applicable the Company shall not be entitled to issue upon conversion of the Shares and exercise of the Warrant an aggregate number of shares of Common Stock in excess of 19.99% of the Common Stock issued and outstanding on the date hereof, subject to appropriate and equitable adjustment for any stock split, stock dividend or reclassification of the Common Stock or similar event occurring after the date hereof (the "20% Cap"), unless the Company receives stockholder approval for such issuance. If Rule 4350(i)(1)(D) of the Nasdaq is applicable to the shares of Common Stock issuable upon conversion of the Shares and exercise of the Warrant and the limitations thereof restrict the Company from issuing additional shares of Common Stock upon conversion of the Shares or exercise of the Warrant, then the Company shall use its commercially reasonable best efforts to obtain, as promptly as practicable, but in no event later than 120 days thereafter, the stockholder approval that is necessary under the rules of the Nasdaq so that the 20% Cap would no longer be applicable to issuance of shares of Common Stock upon conversion of the Shares and exercise of the Warrant.

**(b)   *Rule 144.*** The Company acknowledges that, for purposes of determining the holding period under Rule 144 for Underlying Shares issued upon

conversion of the Shares, the holding period of such Underlying Shares shall be tacked to the holding period of the Shares and for purposes of determining the holding period under Rule 144 for Warrant Shares issued in a "net" or "cashless" exercise of the Warrant, the holding period of such Warrant Shares may be tacked to the holding period of the Warrant. The Company agrees not to take a position contrary thereto unless the SEC or its staff by rule or interpretation changes its rules and interpretations thereof in effect on the date of this Agreement or such rules or interpretations are held invalid or incorrect by a court of competent jurisdiction.

### 6.2    *Limitation on Certain Transactions.*

(a)     Beginning as of the date of this Agreement and until the effective date of the Registration Statement as contemplated by the Registration Rights Agreement, without the prior written consent of the Purchaser (which consent may be withheld in the Purchaser's discretion), the Company shall not issue or sell or agree to issue or sell any securities in a capital raising transaction prior to such date, unless such securities will not be, and are not, registered for sale or resale under the 1933 Act until on or after the effective date of the Registration Statement, provided that the limitation of this Section 6.2(a) shall not apply to securities issued pursuant to the Company's duly adopted employee or director bona fide share and option plans.

(b)     So long as any of the Shares remain outstanding, without the prior written consent of holders owning more than 50% of the Shares (which consent may be withheld in such holders' discretion), the Company shall not issue or sell, or agree to issue or sell, any securities in a Variable Rate Transaction.

### 6.3    *Right of the Purchaser to Participate in Future Transactions.*

***(a)    Right to Participate.*** So long as any of the Shares remain outstanding, the Purchaser will have a right to participate in any sales of any of the Company's securities in a capital raising transaction on the terms and conditions set forth in this Section 6.3. During such period, the Company shall give ten Business Days advance written notice to the Purchaser prior to any non-public offer or sale of any of the Company's capital stock or any Common Stock Equivalents in a capital raising transaction by providing to the Purchaser a comprehensive term sheet containing all significant business terms of such a proposed transaction. The Purchaser shall have the right to participate in such proposed transaction and to purchase 25 percent of such securities which are the subject of such proposed transaction for the same consideration and on the same terms and conditions as contemplated for such third-party sale (or such lesser portion thereof as specified by the Purchaser). If the Purchaser elects to exercise its rights hereunder it must

deliver written notice to the Company within five (5) Business Days following receipt of the notice and comprehensive term sheet from the Company, which notice from the Purchaser shall be contingent upon receipt of satisfactory definitive documents for such transaction from the Company. If, subsequent to the Company giving notice to the Purchaser hereunder but prior to the Purchaser exercising its right to participate (or the expiration of the five-day period without response from the Purchaser or the rejection of such offer for such financing by the Purchaser), the terms and conditions of the proposed third-party sale are changed from that disclosed in the comprehensive term sheet provided to the Purchaser, the Company shall be required to provide a new notice and comprehensive term sheet reflecting such revised terms to the Purchaser hereunder and the Purchaser shall have the right, which must be exercised within five (5) Business Days of such new notice and such revised comprehensive term sheet, to exercise its rights to purchase the securities on such changed terms and conditions as provided hereunder. In the event the Purchaser does not exercise its rights hereunder with respect to a proposed transaction within the period or periods provided, or affirmatively declines to engage in such proposed transaction with the Company, then the Company may proceed with such proposed transaction on the same terms and conditions as noticed to the Purchaser (assuming the Purchaser has consented to the transaction, if required, pursuant to Section 6.2 of this Agreement) with the Purchaser if it has elected to participate in such proposed transaction, *provided* that if such proposed transaction is not consummated within 60 days following the Company's notice hereunder, then the right of first refusal hereunder shall again apply to the Purchaser for such proposed transaction. The rights and obligations under this Section 6.3 shall in no way diminish the other rights of the Purchaser pursuant to this Section 6.

(b) *Limitation on Right of First Refusal.* Notwithstanding anything to the contrary contained herein, the number of shares of Common Stock that may be acquired directly or through acquisition of Common Stock Equivalents by the Purchaser pursuant to any capital raising transaction as described in subsection (a) above shall not exceed a number that, when added to the total number of shares of Common Stock deemed beneficially owned by the Purchaser (other than by virtue of the ownership of securities or rights to acquire securities (including the Shares and Warrant) that have limitations on the Purchaser's right to convert, exercise or purchase similar to the limitation set forth herein (the "Excluded Shares")), together with all shares of Common Stock deemed beneficially owned (not counting such affiliate's Excluded Shares) by the Purchaser (as defined in Rule 144 of the 1933 Act) (the "Aggregation Parties") that would be aggregated for purposes of determining whether such securities are beneficially owned by the Purchaser or for purposes of determining whether a group exists, in each such case for purposes of Section 13(d) of the 1934 Act and Regulation 13D-G thereunder, would result in beneficial ownership by the Purchaser or such group of more than 9.9% of the shares of the Company's Common Stock (the "Restricted Ownership

-19-



Percentage"), computed in accordance with Regulation 13D-G. The Purchaser shall have the right at any time and from time to time to reduce its Restricted Ownership Percentage immediately upon notice to the Company in the event and only to the extent that Section 16 of the 1934 Act or the rules promulgated thereunder (or any successor statute or rules) is changed to reduce the beneficial ownership percentage threshold thereunder from 10%.   If the Purchaser is unable by reason of the Restricted Ownership Percentage to acquire the full amount of securities which the Purchaser would otherwise be entitled to acquire pursuant to this Section 6.3 and thereafter, at any time prior to the conversion in full of the Shares the Purchaser could acquire such securities without exceeding its Restricted Ownership Percentage, then the Purchaser shall be entitled to acquire such securities at such time.

**6.4    *Reports and Information.***  For so long as the Purchaser beneficially owns any of the Securities, the Company will furnish to the Purchaser the following reports and information, each of which shall be provided to the Purchaser by e-mail (at such address as specified in writing by the Purchaser for such purpose) or reputable overnight courier:

**(a)    *Quarterly Financial Information.***  In the absence of a Quarterly Report on Form 10-Q timely filed with the SEC for any of the Company's first three fiscal quarters in any fiscal year, within 45 days after the end of any such fiscal quarter consolidated balance sheets of the Company as at the end of each of the Company's first three fiscal quarters and the related consolidated statements of operations, stockholders' equity and cash flows for such period and for the portion of the Company's fiscal year ended on the last day of such quarter, all in reasonable detail and certified by the principal financial officer of the Company to have been prepared in accordance with Generally Accepted Accounting Principles, subject to year-end and audit adjustments.

**(b)    *Annual Financial Information.***  In the absence of a Form 10-K timely filed with the SEC within 105 days after the end of any fiscal year, then within such period consolidated balance sheets of the Company as at the end of each fiscal year and the related consolidated statements of earnings, stockholders' equity and cash flows for such year, all in reasonable detail and accompanied by the report on such consolidated financial statements of an independent certified public accountant selected by the Company and reasonably satisfactory to the Purchaser.

**(c)    *Stockholder and Analyst Reports and Information.***  Copies of all notices, financial statements, reports and documents as the Company shall send or make available generally to its stockholders or to financial analysts, promptly after providing same to the stockholders or financial analysts.